## Ex Parte Kristin Hope WHEELER.

### No. 2–01–133–CR.

Court of Appeals of Texas, Fort Worth.

July 22, 2004.

Jerry J. Loftin, Fort Worth, for appellant.

Tim Curry, Criminal Dist. Attorney, Charles M. Mallin, Steven W. Conder, Lloyd Whelchel, Susannah Touzel Asst. Criminal Dist. Attorneys, Fort Worth, for state.

Panel A: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

### OPINION ON REMAND

TERRIE LIVINGSTON, Justice.

In November 2001, we issued our opinion reversing the trial court's denial of habeas relief on direct appeal. Because we determined that the State knew or should have known that its question on fault findings in a separate insurance investigation would likely result in a mistrial, we granted appellant's special plea on double jeopardy grounds. We rendered judgment granting appellant habeas relief and dismissed her case with prejudice to refiling because of the mistrial.

On the State's petition for review, the Texas Court of Criminal Appeals vacated our judgment and remanded the case to us for further review in light of its *Peterson* opinion, which was issued in 2003, after our earlier opinion. *Ex Parte Peterson,* 117 S.W.3d 804 (Tex.Crim.App.2003). In *Peterson,* the court of criminal appeals clarified "the standards under which the Texas constitutional double jeopardy provision, as explained in *Bauder v. State,* prohibits retrial after the defense successfully requests a mistrial." *Id.* at 807. The

parties have rebriefed in light of the *Peterson* opinion, and we have resubmitted the case to apply the *Peterson* construct. Because we conclude that the record shows prosecutor misconduct that meets the *Peterson* three-prong analysis, we still reverse and render.

### Facts

On July 21, 1999, Dr. David Mitchell attempted to cross a rural road to access his mailbox as appellant drove down the same road at approximately sixty-five miles per hour. Appellant, traveling about twenty miles per hour over the speed limit, was unable to avoid striking Mitchell, who later died of the injuries he sustained. The grand jury indicted appellant in two counts for manslaughter and criminally negligent homicide. A visiting judge presided over the first trial, held in Criminal District Court Number One.

During the first trial, both the State and appellant called accident reconstruction experts. The State extensively cross-examined and questioned appellant's only witness, her expert, Alan Weckerling. After appellant passed the witness following a redirect, the following exchange took place:

THE COURT: Anything else?

[PROSECUTOR]: Yes, Your Honor—

THE COURT: Thank you, sir. You may stand down.

[PROSECUTOR]: I have one more question, Judge.

THE COURT: I'm sorry. I misunderstood you.

### FURTHER RECROSS–EXAMINATION

[PROSECUTOR:] Are you aware that her insurance carrier found her at fault?

[DEFENSE]: Your Honor, may we approach?

THE COURT: You don't have to approach. Send the jury out.

(Jury not present)

THE COURT: Is there a motion in limine on that?

[PROSECUTOR]: Only if she ever paid, Judge—

[DEFENSE]: Your Honor, they filed a motion in limine not to go into any of the insurance reports. They now have made a statement unsupported in bad faith to create a mistrial in this case.

THE COURT: Do you want a mistrial?

Appellant answered affirmatively. The visiting judge who had heard the entire case also heard the parties' arguments a few days later and granted appellant's motion for a mistrial. After the visiting judge's appointment expired, the regular presiding judge of the court reset the case for a second trial the following month. At that time, appellant refiled her motion to dismiss with prejudice and filed a petition for a pretrial writ of habeas corpus. The visiting judge who presided over the first trial and the hearing on the mistrial did not hear the habeas petition. Instead, the trial court's presiding judge heard the petition and denied relief. Our opinion, reversing and rendering in appellant's favor, was vacated by the court of criminal appeals and is now before us again as explained above.

### Double Jeopardy

■ The double-jeopardy clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. CONST. amend. V. This clause protects against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple

punishments for the same offense. *United States v. Dixon*, 509 U.S. 688, 695–96, 113 S.Ct. 2849, 2855–56, 125 L.Ed.2d 556 (1993); *Ex parte Herron*, 790 S.W.2d 623, 624 (Tex.Crim.App.1990) (op. on reh'g). The Texas and United States Constitutions' double jeopardy provisions provide substantially identical protections. *Ex parte Mitchell*, 977 S.W.2d 575, 580 (Tex. Crim.App.1997), *cert. denied*, 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140 (1998); *Stephens v. State*, 806 S.W.2d 812, 815 (Tex.Crim.App.1990), *cert. denied*, 502 U.S. 929, 112 S.Ct. 350, 116 L.Ed.2d 289 (1991). Both constitutions are meant to restrain the government from subjecting persons accused of crimes to the mental, emotional, and financial hardship of repeated trials for the same offense. *See Bauder v. State*, 921 S.W.2d 696, 698 (Tex.Crim.App.1996) (*Bauder I*).

A mistrial granted at the defendant's request in a criminal case, however, usually does not implicate double jeopardy prohibitions and poses no inhibition to further prosecution for the same offense in a new proceeding. *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971); *Torres v. State*, 614 S.W.2d 436, 441 (Tex.Crim.App. [Panel Op.] 1981). Essentially, we view a defendant's motion for mistrial as a deliberate election on her part to forgo her right to have her guilt or innocence determined before the first trier of fact. *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982); *United States v. Scott*, 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978).

When a mistrial is declared because of improper actions of the prosecutor, however, the double jeopardy prohibition may bar a second prosecution even if the defendant has consented to the mistrial. *Peterson*, 117 S.W.3d at 811. It is well settled under the federal constitution that the Fifth Amendment does not allow successive prosecutions for the same offense when the earlier proceeding was terminated at the defendant's request because the attorney representing the government *deliberately* provoked the defendant's motion for mistrial. U.S. CONST. amend. V; *see Kennedy*, 456 U.S. at 676, 102 S.Ct. at 2095. The Texas Constitution goes a step beyond the protection provided under its federal counterpart and prohibits a subsequent trial when the prosecutor caused the mistrial *either intentionally or recklessly. See Ex parte Bauder*, 974 S.W.2d 729, 731 (Tex.Crim.App.1998) (*Bauder II*); *Bauder I*, 921 S.W.2d at 697; *see also* TEX. CONST. art. I, § 14. The court of criminal appeals announced in *Bauder I* that a subsequent prosecution is jeopardy-barred by the Texas Constitution after declaration of a mistrial when objectionable conduct of the prosecuting attorney was intended to induce a motion for mistrial or if "the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request." *Bauder I*, 921 S.W.2d at 699.

In *Bauder II*, the court of criminal appeals clarified the application of the prosecutor-misconduct bar to retrial, determining that the only question under the Texas Constitution's double-jeopardy clause is whether the defendant truly consented to, or deliberately elected, the mistrial. *Bauder II*, 974 S.W.2d at 731–32. *Bauder II* directs that in a case where a mistrial has resulted from prosecutorial action, weighing the following two options will illustrate whether the defendant voluntarily consented to the mistrial and should be subject to retrial:

> [O]n the one hand, whether the appellant's motion for mistrial was a choice he made in response to ordinary reversible error in order to avoid conviction, ap-

peal, reversal, and retrial. Or, on the other hand, was he required to move for mistrial because the prosecutor deliberately or recklessly crossed "the line between legitimate adversarial gamesmanship and manifestly improper methods" that rendered trial before the jury unfair to such a degree that no judicial admonishment could have cured it?

*Id.* at 732 (citation omitted) (quoting *Bauder I*, 921 S.W.2d at 700).

Then, in *State v. Lee*, another double jeopardy-mistrial case but one in which both the trial court and the intermediate appellate court granted habeas relief on double jeopardy grounds, the State urged the court of criminal appeals to abandon its more expansive interpretation of the Texas constitutional prohibition against double jeopardy, but the court declined its offer. 15 S.W.3d 921, 922 n. 1 (Tex.Crim. App.2000) (dismissing State Prosecuting Attorney's grounds for review because district attorney's grounds were dispositive). Instead, the court emphasized that trial courts are to find a double jeopardy violation only under the standard articulated in *Bauder II*, i.e. when a defendant is *required* to move for a mistrial "because the prosecutor deliberately or recklessly crossed 'the line between legitimate adversarial gamesmanship and manifestly improper methods' that rendered trial before the jury unfair to such a degree that no judicial admonishment could have cured it." *Bauder II*, 974 S.W.2d at 732 (citation omitted) (quoting *Bauder I*, 921 S.W.2d at 700); *see also Lee*, 15 S.W.3d at 924.

Under *Lee*, "if the prosecutor has a 'legitimate' view of the law (or of the facts), even if that view is ultimately incorrect, his actions cannot be considered intentional or reckless misconduct." *Peterson*, 117 S.W.3d at 816 (quoting *Lee*, 15 S.W.3d at 924). Thus, in *Peterson*, the court of criminal appeals concluded that the "prosecu-

tor's *mens rea* is pivotal." *Id.* at 815. Looking to the United States Supreme Court opinion in *Kennedy*, the court of criminal appeals noted that under the *Kennedy* line of cases, the "critical inquiry is whether the prosecutor's misconduct intended to goad the defendant into requesting a mistrial, and under *Bauder* ... a prosecutor must at least be aware that his manifestly improper misconduct is likely to result in a mistrial, but he nonetheless consciously ignores that likelihood and commits the misconduct." *Id.* at 816. *See generally Kennedy*, 456 U.S. at 675–76, 102 S.Ct. at 2089 (discussing intent of prosecutor and prosecutorial conduct in determining whether double jeopardy bars retrial). In *Peterson*, the court blended the *Kennedy*, *Bauder*, and *Lee* tests and held that the trial and appellate courts of Texas are to analyze a double jeopardy claim under the following three-part analysis:

1) Did manifestly improper prosecutorial misconduct provoke the mistrial?

2) Was the mistrial required because the prejudice produced from that misconduct could not be cured by an instruction to disregard?

3) Did the prosecutor engage in that conduct with the intent to goad the defendant into requesting a mistrial (*Kennedy* standard) or with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial (*Bauder* standard)?

*Peterson*, 117 S.W.3d at 816–17.

## Standard of Review

When raising a double jeopardy claim on pretrial writ of habeas corpus, the applicant bears the burden of proof under a preponderance of the evidence standard in the trial court. *Id.* at 818 (citing *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim.App.1993) and *Ex parte Adams*, 768

S.W.2d 281, 287–88 (Tex.Crim.App.1989)). When we review a trial court's decision to grant or deny relief on a writ of habeas corpus, we review the "facts in the light most favorable to the trial judge's ruling and should uphold it absent an abuse of discretion." *Id.* at 819; *accord Ex parte Mann*, 34 S.W.3d 716, 718 (Tex.App.-Fort Worth 2000, no pet.); *Ex parte Primrose*, 950 S.W.2d 775, 778 (Tex.App.-Fort Worth 1997, pet. ref'd). We should "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Peterson*, 117 S.W.3d at 819 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997)).

However, "an abuse of discretion review of trial court decisions is not necessarily appropriate in the context of the application of law to facts when the decision does not turn on the credibility or demeanor of witnesses." *Ex parte Martin*, 6 S.W.3d 524, 526 (Tex.Crim.App.1999). Instead, an appellate court must conduct a de novo review when "the trial judge is not in an appreciably better position than the reviewing court to make that determination." *Guzman*, 955 S.W.2d at 87; *see also Mann*, 34 S.W.3d at 718. "Although reviewing courts should also grant deference to 'implicit factual findings' that support the trial court's ultimate ruling, they cannot do so if they are unable to determine

from the record what the trial court's implied factual findings are." *Peterson*, 117 S.W.3d at 819. Reviewing courts are to review "*de novo* those mixed questions of law and fact that do not depend upon credibility and demeanor." *Id.* (citing *Guzman*, 955 S.W.2d at 89). In *Peterson*, the court of criminal appeals reviewed its opinions in *Bauder I*, *Bauder II*, and *Lee* and again declined to overrule its *Bauder* line of cases.

## Analysis

In this case, neither party offered testimony on the merits of the petition at the habeas hearing; the parties had previously presented their arguments for and in opposition to granting a mistrial and dismissal with prejudice at the mistrial hearing held by the visiting judge. That judge granted appellant's motion, and the arguments and record from that hearing were offered into evidence at the writ hearing. However, the presiding judge, who ultimately heard the petition, was not the same judge who that presided over appellant's first trial and granted the mistrial. Thus, the trial court's rulings at the habeas hearing could not have turned on credibility and demeanor.[1] Because the presiding judge who heard and ruled on the habeas petition was not in any better position to determine questions of fact and to apply the law to those facts than we would be, we will undertake a de novo review applying the new *Peterson* three-

1. The State argues that because the habeas judge stayed in contact with the visiting judge who presided over appellant's trial while the trial progressed, because the habeas judge read the record, and because the prosecutor regularly appears before the habeas judge, the habeas judge was, somehow, in a position to gauge the credibility of the prosecutor's explanations at the hearing on the motion for a mistrial. However, the State cites, and we have located, no authority that allows a judge to assess the credibility and demeanor of wit-

nesses remotely. In contrast, the visiting judge who presided over the entire trial was in a better position to make credibility determinations and weigh the harm caused by the error. Therefore, we should give, and the presiding judge should have given, more deference to the visiting judge's findings and conclusions. This is particularly true if we accept the State's position that its "arguments" at the mistrial hearing may also be considered testimony.

prong analysis. *See Peterson*, 117 S.W.3d at 816–17; *Guzman*, 955 S.W.2d at 87. Further, our review of what the habeas judge did necessarily includes a review of what the visiting judge, who presided over the trial and granted the mistrial, did. Because the visiting judge's ruling is in the record and includes some findings and conclusions, we will review his ruling under an abuse of discretion standard.[2]

### 1) Did Manifestly Improper Prosecutorial Misconduct Provoke The Mistrial?

■ Under this prong of the *Peterson* analysis, we must focus on whether misconduct occurred and whether that misconduct caused the defense to request a mistrial. *Bauder I* teaches us that courts should narrowly interpret the "objective facts and circumstances of the prosecutor's conduct and the events which led to that conduct" in determining whether prosecutorial misconduct actually occurred. *Peterson*, 117 S.W.3d at 814–15. Further, we are to look at whether the defendant was compelled to request a mistrial because she was denied her free choice of requesting a mistrial. *Id.* at 816.

■ After several redirects and recrosses and long after the State had already informed the court that it had only one more question, the prosecutor asked one more question of appellant's expert witness: "Are you aware that her insurance carrier found her at fault?" Appellant's counsel immediately asked to approach the bench. The court immediately said that approaching the bench was unnecessary and ordered the jury removed.

The court asked if appellant wanted a mistrial even before appellant could articulate her objection. The court took appellant's motion for mistrial under advisement and reconvened court the following Monday to hear counsels' arguments and to rule on the motion. The court recalled the specific question that the prosecutor asked appellant's expert witness, "Are you aware that her insurance carrier found her at fault?"

■ In support of her claim for mistrial and a dismissal with prejudice, appellant's counsel reminded the court of the pretrial motions in limine that both sides had filed and that had been granted by the trial court. Both sides had obtained a limine order prohibiting either from asking any witness for declarations or statements made by someone other than the witness or asking for opinions from witnesses that were not expert witnesses. An earlier question asked by the State of its expert revealed only that there was insurance on the Mustang—appellant's car that was involved in the wreck. No prior question of fault had been asked or answered in regard to an insurance investigation or the results of any such investigation despite the prosecutor's representations to the court that the defense had "opened the door."

In its brief on remand, the State cites to this court's prior opinion and the habeas record as proof that the defense (or the State, for that matter) had "opened the door" to the insurance/fault question. However, the State is citing only to its *own previous arguments* made to the habeas judge, that the "door had been

---

**2.** The visiting/presiding judge's findings and conclusions must be reviewed because they relate specifically to so many of the *Peterson* factor determinations we must make. The court's verbal rulings on the record reflect the court's findings and conclusions. If the court of criminal appeals concludes that these find-ings and conclusions are insufficient to our review of the "objective facts and circumstances surrounding the event which led to the mistrial," we would abate to the trial court for an abatement hearing. *See Peterson*, 117 S.W.3d at 818; *see also Wead v. State*, 129 S.W.3d 126, 129 (Tex.Crim.App.2004).

opened" by someone. The State fails to cite in its brief, and failed to cite to the habeas judge any record references proving that the door to a third party or other fault determination had been opened. The State points to only two places in the record where it contends the "door was opened." It points to *its expert's* testimony, in which its expert testified *on direct* that he had looked at the insurance report, and to appellant's expert's testimony.

First, the State's expert testified that he looked at the report only in regard to repairs on the Mustang involved in the wreck. Second, the State references defense expert testimony that does not even exist. There is no page 168 contained in the seventh volume of the reporter's record. Regardless, the record actually discloses the opposite in regard to testimony by the defense expert: when the State asked Dr. Wecklerling if he had reviewed any other investigations by an insurance company or other individuals, he acknowledged the existence of "something" in the materials that were provided to him but specifically stated he had *not* reviewed them. The only testimony that relates to insurance was given by the State's expert, Tim Lovett, who said he had reviewed a State Farm investigative report in connection with the "repair of the Mustang" involved in the accident. At this point, the State neither asked for nor did the witness supply any determination on fault by any insurance company. This hardly opens the door to fault, a question that goes directly to the heart of this cause.

As we noted in our prior opinion, the only issue for this jury to decide was whether the victim was at fault, or whether appellant was at fault and, if so, with what mental state so as to determine whether manslaughter or criminally negligent homicide was the appropriate offense. In other words, because appellant had nev-

er denied that she was the person driving the vehicle that struck the victim, the focus of the entire trial was who was at fault. The visiting judge's findings or conclusions on the record make this clear:

> There is one issue in this case and that's who is at fault. The defendant ... or the deceased. Both sides knew as of Thursday I told you all I was going to instruct the jury on concurrent cause that could have allowed the jury if they decided to do so based on the evidence and the law found the defendant not guilty assuming they found beyond a reasonable doubt the [deceased] was guilty to start with. So the only issue in this case was fault. This question goes right to that. It is not a collateral question [sic] not a collateral issue.

Additionally, the rules of evidence prohibit the admission of evidence of insurance coverage. TEX.R. EVID. 411. The rules of evidence clearly do not allow evidence of insurance coverage to be introduced in most circumstances. *Id.* ("Evidence that a person was or was not insured against liability is not admissible upon the issue of whether the person acted negligently or otherwise wrongfully."). Appellant specifically raised the applicability of rule 411 of the rules of evidence at the hearing on the motion for mistrial. Appellant noted that the question of whether a person acts "negligently or otherwise wrongfully" is basically the same question the jury would have to decide if the jury had found appellant at fault as opposed to the victim. Manslaughter is defined as "recklessly caus[ing] the death of an individual," and "criminally negligent homicide" is defined as "caus[ing] the death of an individual by criminal negligence." TEX. PENAL CODE ANN. §§ 6.03(d), 19.04(a), 19.05(a), (Vernon 2003). Because the charges of manslaughter and criminally negligent homicide would fit within rule

411's confines of when a person acts negligently or otherwise wrongfully, we conclude and hold that rule 411 of the rules of evidence applies equally to criminal cases in which a defendant has been charged with the offenses of manslaughter and criminally negligent homicide.

 On remand, the State further contends that the prosecutor could not be held to have known that evidence of insurance liability findings was inadmissible because there is no criminal case construing or applying rule 411 to a criminal case. *See Dennis v. Hulse*, 362 S.W.2d 308, 309 (Tex. 1962); *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex.App.-El Paso 1993, writ denied) (both holding that the mere mention of insurance does not necessarily result in a mistrial). This argument is not persuasive, however, because the court of criminal appeals specifically adopted the combined, joint set of rules of evidence on February 25, 1998, and they went into effect March 1, 1998. 960 S.W.2d (Tex. Cases) XXX. Also, the rules themselves specifically state that unless provided otherwise by statute, the rules of evidence apply and govern all civil and criminal proceedings. TEX.R. EVID. 101(b). The rules further direct that the rules should be construed to "secure fairness in administration ... and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." TEX.R. EVID. 102. We have found no cases, and the State cites none, that would support the proposition that a rule of evidence or procedure, or a statute, previously adopted and effective, does not apply simply because no court has yet ruled that it should apply. If that were the appropriate prerequisite to the application of rules or statutes, then no statute would ever be in effect until we, the courts, had so stated.

In this case, the prosecutor's question did not merely mention the existence of insurance; rather, the question addresses insurance coverage in the context of a fault finding. Not only should the prosecutor have known that rule 411 prohibits the mention of insurance coverage in this context, he should also have known that, given the timing and subject matter of the question, the prejudicial effect of the evidence would far outweigh any probative value under a rule 403 analysis.[3] TEX.R. EVID. 403 (providing that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice). Additionally, the question, as phrased, asks not if *some* insurance company had found appellant at fault, but whether the witness *knew that appellant's insurance company had found her at fault.* The effect of a question asking whether the witness knew *that*, not *if*, appellant's own insurance company found her at fault is particularly troubling because it implies that the one entity that would normally be supporting appellant had already decided to do otherwise.

We therefore conclude that the prosecution's question was not only manifestly improper, just as the visiting trial judge had found, but also was the catalyst that provoked the mistrial. We turn to the next *Peterson* question.

## 2) Was The Mistrial Required Because The Prejudice Produced From That Misconduct Could Not Be Cured By An Instruction To Disregard?

 This prong of the *Peterson* analysis requires us to look at whether the

---

**3.** The prosecutor asked this question as the last question of the last witness on the last day of the lengthy jury trial.

mistrial was required because the line the prosecutor crossed rendered the trial before the jury so unfair that no judicial admonishment or instruction could have cured the prejudice or harm that resulted from it. *Peterson,* 117 S.W.3d at 816. In other words, we must determine whether an instruction to the jury to disregard the error could have overcome any harm that resulted from the prosecutor's misconduct. *Id.* We defer to the trial court's conclusion on whether an instruction to disregard would have cured the problem. *See Bowen v. State,* 131 S.W.3d 505, 509 (Tex.App.-Eastland 2004, pet. filed).

 The State points us to *Waldo v. State* for some nonexclusive factors the trial court and the appellate court may consider in determining whether a curative instruction would cure the harm: (1) the nature of the error; (2) the persistence of the prosecutor; (3) the flagrancy of the violation; (4) the particular instruction given; (5) the weight of the incriminating evidence; and (6) the harm to the accused as measured by the severity of the sentence. 746 S.W.2d 750, 754 (Tex.Crim. App.1988).

 For instance, the prosecutor's misconduct was so obvious that the court told defense counsel he did not even need to approach the bench and, on its own, instructed the jury to be removed from the courtroom. And, immediately upon its removal, the judge asked appellant, before she had made any legal arguments, if she wanted a mistrial. It is thus clear, from the record before us, that the trial court quickly and immediately decided the prosecution had used improper methods or conduct in its cross-examination of appellant's last witness. But, the court held its decision on the mistrial and then recessed over the weekend, instructing the parties to return the next Monday to argue their positions and the law regarding the proper remedy for the prosecutor's misconduct.[4]

At the hearing the next Monday, appellant focused the trial court's attention on the inefficacy of a curative instruction, especially in a case before a jury where a defendant's negligence or reckless disregard is sufficient for a conviction. Appellant argued that failure to grant the dismissal with prejudice would be tantamount to shifting the burden to the defense in light of the prosecutor's statement about the insurance company's fault finding. Further, appellant pointed to the rule 411 violation, discussed *infra,* as well as the way the question was asked. The prosecutor asked the question as if it were a statement of fact as opposed to the more generic "have you heard question."

In response, the State argued simply that the only "evil complained of in this case is a violation of rule 411" and that we are to presume that an instruction to disregard will cure any prejudice resulting from an improper remark or question. However, the "evil" before us is more than just either one of the foregoing; it is the combination of both a question that asks an expert to testify on improper evidence combined with a question that *presupposes the answer* that makes the question itself so prejudicial. Not only was the question improper because it asked for inadmissible evidence, but the question itself also disclosed inadmissible evidence because the prosecutor asked the question in a way that conveyed the actual insurance investigation result. Thus, the nature of the error is great.

Likewise, we can also conclude that the prosecutor's conduct was flagrant and

4. We point out that the visiting judge gave the parties the opportunity to present the law and arguments for and against the mistrial because the State on remand accuses the visiting judge of making a "reckless decision" for a mistrial. Obviously, the State was mistaken.

weighty. As we have noted above, the question came several questions after the prosecutor had already notified the court that he had only one more question. And, as also mentioned, the trial judge *sua sponte* removed the jury and asked if the defense wanted a mistrial, which is another indication of the court's perception of the flagrancy of the prosecutor's action. The State also contends that this action by the trial judge demonstrates that the judge was "overly quick to declare a mistrial." The State characterizes the trial judge's question as a "reckless declaration" of mistrial. However, the State ignores the fact that the trial judge did not immediately declare a mistrial. In fact, the judge removed the jury, explained on the record his concerns to counsel, and requested briefing and arguments after recessing over the weekend. The judge did not rule on the mistrial until he had conducted independent research, listened to counsels' arguments, and concluded the hearing on the following Monday. This cannot be construed as a hasty decision on the part of the visiting judge and actually reflects the flagrancy of the misconduct as well as its significance and weight.

Under the objective facts and circumstances presented in this record, we conclude that no instruction could have cured the prejudice that must have flowed from the prosecutor's question revealing that appellant's own insurance company had found her at fault—again, the key issue of the case.

3) **Did The Prosecutor Engage In Conduct With The Intent To Goad The Defendant Into Requesting A Mistrial (*Kennedy* Standard) Or With Conscious Disregard For A Substantial Risk That The Trial Court Would Be Required To Declare A Mistrial (*Bauder* Standard)?**

In addressing the third *Peterson* prong, the court of criminal appeals also instructs

us that we should consider the following, where applicable:

1) Was the misconduct a reaction to abort a trial that was "going badly for the State?" In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?

2) Was the misconduct repeated despite admonitions from the trial court?

3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

4) Was the conduct "clearly erroneous"?

5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?

*Peterson*, 117 S.W.3d at 818–19 (footnotes omitted); *see also State v. Easton*, 123 S.W.3d 675, 681 (Tex.App.-Dallas 2003, no pet.)

a) **Trial Going Badly for the State?**

 The State says that the trial was going well. In making this claim, the State cites only to its expert's testimony on direct. The State's evaluation of its case in its brief on remand includes a review of the status of its case based only upon its expert's testimony; its evaluation fails to take into account the fact that appellant had not yet presented her case.

Further, the State points only to its expert's testimony concluding that appellant was speeding and that she had failed to control the vehicle and timely apply her

brakes. In its brief, the State fails to re-evaluate its case after the defense had put on its case, in which the defense expert testified that appellant's speed was imma-terial because the victim stepped into the road without yielding to vehicles even though he was not at a street crossing. According to the defense witness, a pedes-trian is supposed to yield to traffic when not crossing at a designated crossing.

Although the State concedes that the case was a "battle of the experts" and that expert testimony was critical to the causa-tion or fault issue, we also know from the hearing on the motion for mistrial that the visiting judge had already notified the par-ties the day before the prosecutor asked the improper question that he was going to give the jury the "concurrent cause" ques-tion. This question would ask who was at fault before even asking the jury whether appellant had the requisite mental intent required for conviction. In light of this, we therefore conclude that the trial was going badly for the State.

## b) Did the State repeat its misconduct despite admonitions from the Court?

■■■ Again, the State argues that nei-ther of the motions in limine, which would have required counsel to approach the bench before questioning any witness on covered items, prohibited mentioning lia-bility insurance. However, as discussed above, the State's own limine order prohib-ited both counsel from asking a witness to testify about another's conclusions or testi-mony. And, appellant's limine order also prohibited asking about any settlements. While the orders are not examples of clari-ty, one could at least conclude that neither party was supposed to go into opinion testimony of any other person not on the witness stand without first approaching the bench.

The State also points to the two refer-ences to insurance as if the fault issue were already before the jury. There are only two places in the record that mention insurance: first, the question the State asked its expert about what he reviewed, which referenced insurance in general in regard to the Mustang; and second, the question the State asked appellant's ex-pert, which ultimately caused the mistrial. Again, these references did not open the door to further questions and did not mean that any pending limine orders had been waived. Thus, we conclude the State re-peated its misconduct when viewed in light of the pre-existing limine orders.

## c) Did the prosecutor provide a reason-able, good faith explanation for the conduct?

■■■ In response to the court's ques-tion to the prosecutor as to why he asked the last question after already cross-exam-ining the witness for three hours, he said, "Judge, I got to ask it sometime." With-out more of an explanation, this cannot be considered a reasonable, good faith expla-nation for the conduct, and neither were the other arguments the State made at the hearing addressed elsewhere in this sec-tion.

## d) Was the conduct "clearly errone-ous?"

■■■ The prosecutor argued that he had the right to cross-examine the de-fense's expert because the witness was an expert and, under rule 702, experts are allowed to be impeached by and cross-examined on anything they have reviewed. TEX.R. EVID. 702. However, as we know from the record, the defense expert had never reviewed the insurance file the pros-ecutor asked about; he just knew it was there. Therefore, a question asking the defense expert about the content and re-

sult of an insurance investigation that he had never reviewed was clearly erroneous.

### e) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

The prosecutor's 702 argument could be applicable to this inquiry except for its inapplicability on this record as explained above under our "clearly erroneous" analysis. Likewise, we have already dispensed with the State's arguments regarding the inapplicability of rule 411. Therefore, we cannot conclude there was a legally or factually plausible basis for the conduct.

### f) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?

 Appellant, on trial for manslaughter and criminally negligent homicide, did not dispute that she drove the car that struck the victim, so the only question before the jury was whether the victim or appellant was at fault. The prosecutor's question asking the defense expert's knowledge of the *results* of an insurance investigation, despite knowing that he had not reviewed the contents of the report and that he only knew that it dealt with insurance on the car involved, both disclosed the existence of insurance coverage and informed the jury that others had independently determined that appellant had acted negligently or recklessly.

Likewise, the prosecutor's explanation for asking the question—"Judge, I got to ask it sometime"—also shows that the prosecutor had actually planned on asking the question. From this, we can only conclude that the prosecutor engaged in this conduct with at least a conscious disregard for a substantial risk that the trial court would be required to declare a mistrial.

For this reason, we conclude that the prosecutor had the requisite *mens rea* such that when he crossed the line he knew or was aware that this last question was improper and could result in a mistrial, yet he proceeded to ask the question anyway. *See Ex parte Twine*, 111 S.W.3d 664, 669 (Tex.App.-Fort Worth 2003, pet. ref'd).

 In light of this, we do not believe the visiting judge abused his discretion when he granted the mistrial. The visiting judge who heard the case and viewed the buildup before the question knew when the prosecution had "kicked the dog" as opposed to "stumbling over it." *See Peterson*, 117 S.W.3d at 814, 818. We do, however, conclude that the court hearing the writ later abused its discretion in denying appellant's double jeopardy plea.

### Conclusion

We hold that the prosecutor, necessarily being acquainted with our rules of evidence, should have known that his question crossed "the line between legitimate adversarial gamesmanship and manifestly improper methods" and created a substantial risk that a mistrial would result. *Bauder II*, 974 S.W.2d at 732. Having held that the prosecutor intentionally or recklessly caused the trial to end in a mistrial, we sustain appellant's sole point.

Because the prohibition against double jeopardy bars a second prosecution of appellant under the manslaughter and criminally negligent homicide indictment, we reverse the order of the trial court and render judgment dismissing the case with prejudice. *See* TEX.R.APP. P. 43.2(c).