**Ex parte Kristin Hope WHEELER, Applicant.**

**No. PD–1216–04.**

Court of Criminal Appeals of Texas.

Oct. 4, 2006.

Jerry J. Loftin, Fort Worth, for appellant.

Steven W. Conder, Asst. Criminal District Atty., Fort Worth, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

COCHRAN, J., delivered the opinion of the Court, in which MEYERS, PRICE, WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

In this manslaughter/criminally negligent homicide trial, the visiting judge granted a defense-requested mistrial when the prosecutor asked the defendant's expert, "Are you aware that her [the defendant's] insurance carrier found her at fault?" The defendant then filed a habeas corpus application, claiming that a second trial was barred by federal and Texas constitutional double-jeopardy principles. The trial court denied relief. The court of appeals held that "the prosecutor intentionally or recklessly caused the trial to end in a mistrial," so it reversed the trial court and dismissed the case with prejudice.[1] We conclude that the court of appeals misapplied the standard of review by failing to assess the objective facts "in the light most favorable to the trial judge's ruling."[2] Under that standard, the trial judge did not abuse her discretion in deny-

---

1. *Ex parte Wheeler,* 146 S.W.3d 238, 253 (Tex. App.-Fort Worth 2004).

2. We granted the State's five grounds for review:
 1) Did the court of appeals err by misapplying the standard of review mandated by this Court in *Ex parte Peterson* to be utilized in determining when a successive prosecution is jeopardy barred after a declaration of a mistrial at a defendant's request?
 2) Did the court of appeals err by shifting the burden of proof to the State in the hearing on the appellant's pre-trial writ of habeas corpus?
 3) Did the court of appeals err by holding that the prosecutor's action in mention-

ing the appellant's insurance carrier was prohibited and inadmissible under TEX.R. EVID. 411 and was incurable by instruction to disregard?
 4) Did the court of appeals err by holding that the appellant did not "open the door" to the prosecutor's questioning of her accident reconstruction expert about whether the expert considered the insurance company's report as to fault?
 5) Should this Court re-adopt the standard of review articulated in *Oregon v. Kennedy?*

Because the State's first ground for review is dispositive, we need not address its remaining grounds.

ing Ms. Wheeler's double-jeopardy claim. We therefore reverse the judgment of the court of appeals and remand this case for further proceedings in the trial court.

## I.

On the afternoon of July 21, 1999, Herman West was driving down a rural road in southwest Tarrant County when he saw Dr. David Mitchell standing near the rear of his parked truck, ready to walk across the road to his mailbox. A few seconds later, Mr. West saw a white Ford Mustang pass him in the opposite direction. Eighteen-year-old Kristin Wheeler was driving that Mustang. Mr. West heard the squeal of brakes, and, looking in his rear-view mirror, saw Dr. Mitchell flying through the air above the Mustang. He immediately turned his truck around and drove back to the accident scene. Dr. Mitchell later died from his injuries, and Ms. Wheeler was charged with manslaughter and criminally negligent homicide. The primary contested issue at trial was, "Who was at fault in causing this accident and Dr. Mitchell's death?" The State's theory was that Ms. Wheeler caused the accident because she was speeding and failed to exercise proper control of her car. The defense theory was that Dr. Mitchell failed to look before he walked into the road, and he failed to yield the right-of-way to the oncoming car. The trial was a battle between the State and defense accident-reconstruction experts.

After the State put on its case-in-chief, the defense called Alan B. Weckerling, an expert in accident-reconstruction analysis. His measurements, calculations, methodology, and conclusions differed significantly from those offered by Tim Lovett, a certi-

fied peace officer and the State's expert accident investigator who had testified extensively over four different days.[3] Much of Mr. Weckerling's opinion was based on a tape-recorded statement given by Mr. West a few days after the accident. This tape recording of Mr. West's eyewitness account and his actions immediately after the accident was played to the jury. What the attorneys knew, but the jury apparently did not, was that the tape recording had been made by Ms. Wheeler's insurance adjuster, who conducted his own investigation of the accident. Based on Mr. West's recorded recollection of time, distance, and other factors, Mr. Weckerling concluded that it would not have mattered whether Ms. Wheeler was speeding-there was not time for her to avoid hitting Mr. Mitchell once he appeared out from behind his truck and started across the road in front of her. After Mr. Weckerling's lengthy direct testimony over two days, the State cross-examined him for three hours.

The defense then conducted redirect and clarified Mr. Weckerling's testimony in several respects. The State briefly re-cross-examined. Then, the defense, on re-redirect examination, asked a summing-up question: "Sir, based on everything that you have heard, all of the cross-examination, every exhibit you have looked at, going to the scene, reviewing every document, autopsy, this, that and the other, what caused the accident?" Mr. Weckerling responded: "The pedestrian walking in front of the Mustang." The defense passed its witness for the third time. The record then shows the following:

Court: Anything else?

State: Yes, Your Honor—

**3.** Because of various continuances and recesses, Mr. Lovett's testimony was not completed until twelve days after it began. By then, the advocates' tempers were frayed. At

one point the visiting judge noted, outside the presence of the jury, "Both sides are being playgroundish. I'm getting tired of it.... It seems to me that it's juvenile on both sides."

Court: Thank you, sir. You may stand down.

State: I have one more question.

Court: I'm sorry I misunderstood you.

State: Are you aware that her insurance carrier found her at fault?

Defense: Your Honor, may we approach?

Court: You don't have to approach. Send the jury out.

(Jury not present)

Court: Is there a motion in limine on that?

State: Only if she ever paid, Judge—

Defense: Your Honor they filed a motion in limine not to go into any of the insurance reports. They now have made a statement unsupported in bad faith to create a mistrial in this case.[4]

Court: Do you want a mistrial?

Defense: Yes, sir—

Defense:[5] With prejudice, Your Honor.

Defense: With Prejudice.

Court: I'm going to take it under consideration. We will recess until Monday morning at 9:00 o'clock.

At the Monday conference, the visiting judge stated that he had researched the issues over the week-end. He listened as both the defense and State set out, at great length, their respective positions concerning the granting of a mistrial; he questioned the prosecutor concerning his legal theory for admission of the insurance investigator's conclusion that Ms. Wheeler was at fault; and, finally, he asked: "Why did you say the very last question, Mr. [prosecutor]? You cross-examined him for three hours." The prosecutor responded:

"Judge, I've got to ask it sometime." The judge then said,

I know. I'm just thinking I don't think I need any more argument. It is a very troublesome case. I made notes for myself. We [have] been at this a month, nine or ten days of actual testimony. This jury has been in and out of the courtroom. You all have fought over everything from pictures of a telephone pole to marking someone else's exhibit. . . .

There is one issue in this case and that's who is at fault, The defendant as alleged or the deceased. Both sides knew as of Thursday[,] I told you all I was going to instruct the jury on concurrent cause. . . . So the only issue in this case was fault. This question goes right to that. It is not a collateral question, not a collateral issue. I am going to grant the motion for mistrial.

The defense later filed an application for a pretrial writ of habeas corpus and a plea of double jeopardy, which was heard by the presiding judge of the court, who stated that she had been in daily contact with the visiting judge during the trial, so she understood the issues. She explained:

I also have the benefit of a letter as well as legal case law that he left me when he left town stating the reasons for his rulings, and quite frankly, some opinions that he seemed to have on the issue before us today.

The defense offered various exhibits into evidence and then rested on its pleading. The State did not call any witnesses, but the trial judge questioned the prosecutor extensively about his reasons for asking the offending question, why he thought the question was a proper one, why he thought

---

**4.** The State's motion in limine did not mention insurance or insurance reports; it requested that no mention of any "monetary settlements" be made.

**5.** Ms. Wheeler was represented by two attorneys at trial.

his question did not violate Rule 411 of the Texas Rules of Evidence,[6] and why he thought that the defense had opened the door to the results of the insurance investigation. The trial judge then questioned the defense about whether it was clear that Rule 411 prohibits the type of question that the prosecutor asked, as there were no Texas criminal cases dealing with Rule 411. After both sides had fully explained their positions, the trial judge ended the hearing without ruling on the defense motion, saying that she wanted to see the transcript of Mr. Weckerling's entire testimony first.

The trial court later denied the defendant's double jeopardy motion and pretrial writ application, and the defense appealed. The court of appeals reversed the trial court and dismissed the charges.[7] This Court then granted the State's PDR[8] and remanded the case for reconsideration under *Ex parte Peterson*,[9] the newly announced clarification of the Texas double-jeopardy analysis set out in *Bauder v. State*.[10] The court of appeals, using the *Peterson* analysis, once again concluded that the trial judge abused her discretion in denying Ms. Wheeler's double-jeopardy claim based on manifestly improper prosecutorial conduct which forced the defense to request a mistrial.[11]

## II.

The double jeopardy provisions of the federal and Texas constitutions protect a citizen from repeated attempts at prosecution for the same criminal offense.[12] However, if a defendant requests a mistrial, double jeopardy normally does not bar reprosecution.[13] Under the federal double jeopardy clause, a retrial is prohibited after the defendant requests and is granted a mistrial only if the prosecution intentionally commits manifestly improper conduct with the intent to provoke that mistrial.[14] In *Bauder v. State*, this Court held that, under the Texas Constitution, double jeopardy principles bar reprosecution when the prosecution acts, not only with the intent to goad the defendant into requesting a mistrial, but also when the prosecutor's reckless misconduct requires a mistrial.[15] Under either standard, the constitutional violation is that of depriving

---

6. Rule 411 reads:

 Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another issue, such as proof of agency, ownership, or control, if disputed, or bias or prejudice of a witness.

 Tex.R. Evid. 411.

7. *Ex parte Wheeler*, 61 S.W.3d 766 (Tex.App.-Fort Worth 2001).

8. *Ex parte Wheeler*, 122 S.W.3d 170 (Tex.Crim.App.2003).

9. 117 S.W.3d 804 (Tex.Crim.App.2003).

10. 921 S.W.2d 696 (Tex.Crim.App.1996).

11. *Wheeler*, 146 S.W.3d at 253.

12. *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) ("The underlying idea [of double jeopardy] ... is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense, and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty").

13. *Oregon v. Kennedy*, 456 U.S. 667, 672–73, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

14. *Id.* at 676, 102 S.Ct. 2083.

15. *Bauder v. State*, 921 S.W.2d 696, 699 (Tex.Crim.App.1996).

the defendant of his chosen jury, a jury presumably poised to acquit him.

In *Ex parte Peterson*, this Court explained that, under *Kennedy*,

> the prosecutor's goal is to terminate a first trial which is going badly. [Under *Bauder* ], the prosecutor's goal is to "win at any price," either by mistrial and a subsequent retrial, or by using manifestly improper means to obtain a conviction in the first trial that he likely would not have achieved otherwise[,] and the prosecutor is aware that his conduct requires a mistrial if the defendant should request it.[16]

■ *Peterson* explained that Texas courts analyze a federal or state constitutional double-jeopardy claim under a three-part test:

1) Did manifestly improper prosecutorial misconduct provoke the mistrial?
2) Was the mistrial required because the prejudice produced from that misconduct could not be cured by an instruction to disregard? And
3) Did the prosecutor engage in that conduct with the intent to goad the defendant into requesting a mistrial (*Kennedy* standard) or with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial (*Bauder* standard)?[17]

The distinction between the federal and state standards is that the former requires a finding that the prosecutor intended to "goad the defendant into requesting a mistrial" because the first trial was likely to end in an acquittal, whereas the latter is satisfied by a finding that the prosecutor acted recklessly and played "foul" to "win at any cost" because the first trial was likely to end in an acquittal were it tried fairly.[18]

■ Under either standard, the trial court must assess the prosecutor's state of mind: Is it a culpable one-an intentional "deep-sixing" of the defendant's chosen factfinder by an act of manifest impropriety or a reckless "win at any cost" act of manifest impropriety. Culpable intent or recklessness is not always easy to discern in this context. The adversarial "rough and tumble" of a hotly contested trial conducted by zealous advocates results in much unplanned, inadvertent, or impulsive rule-violating.[19] In *Peterson*, we quoted Justice Powell's concurring opinion in *Kennedy*, which stressed the importance of relying " 'primarily upon the objective facts and circumstances of the particular case' in determining the prosecutor's subjective intent, which may often be unknowable."[20] We therefore set out a list of non-exclusive objective factors to assist trial and reviewing courts in assessing the

---

**16.** *Peterson*, 117 S.W.3d at 815, n. 37 (citing *Bauder*, 921 S.W.2d at 699).

**17.** *Id.* at 816–17.

**18.** *See, e.g., People v. Batts*, 30 Cal.4th 660, 666, 134 Cal.Rptr.2d 67, 68 P.3d 357, 361 (2003) (holding that the state constitutional double jeopardy clause may bar retrial when the prosecutor subjectively believes that an acquittal was likely when he intentionally committed misconduct and the court determines *"from an objective perspective* that the misconduct actually deprived the defendant of

the reasonable prospect of an acquittal") (emphasis in original); *see also United States v. Wallach*, 979 F.2d 912, 915 (2d Cir.1992) (noting, in dicta, that double jeopardy principles would logically bar a second prosecution when the prosecutor engages in serious misconduct with the intention of preventing an acquittal).

**19.** *See Peterson*, 117 S.W.3d at 817–18.

**20.** *Id.* at 812 (quoting *Kennedy*, 456 U.S. at 679–80, 102 S.Ct. 2083 (Powell, J., concurring)).

prosecutor's state of mind. Those factors include:

1) Was the misconduct a reaction to abort a trial that was "going badly for the State?" In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?

2) Was the misconduct repeated despite admonitions from the trial court?

3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

4) Was the conduct "clearly erroneous"?

5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct? [21]

We, like the Supreme Court in *Kennedy*, are mindful that appellate judges "will not inexorably reach the same conclusion on a cold record at the appellate stage that they might if any one of them had been sitting as a trial judge[,]" thus "[i]t seems entirely reasonable to expect . . . that appellate judges will continue to defer to the judgment of trial judges who are 'on the scene' in this area[.]" [22] In *Peterson*, we stressed the importance of deferring to the trial court's assessment of the facts, including the prosecutor's state of mind. Here, as in other contexts, "appellate courts review the facts in the light most favorable to the trial judge's ruling and should uphold it absent an abuse of discretion." [23]

### III.

■ In the present case, the court of appeals found that the prosecutor's question—"Are you aware that her [the defendant's] insurance carrier found her at fault?"—was manifestly improper.[24] We agree. Whatever else it might be, this question was clearly barred by Rules 401–403 of the Texas Rules of Evidence. What Ms. Wheeler's insurance carrier concluded has very little probative value on the question of whether she caused the fatal accident. There might be many reasons why the insurance carrier would not dispute liability or would ultimately concede it. This is akin to asking the testifying defendant if she was aware that her own attorney-her agent, just as an insurance carrier is a driver's agent-admitted that she should accept a plea bargain. Lawyers impeach witnesses with specific facts, not with someone else's legal concession or ultimate factual decision.

The prosecutor could have called the insurance investigator as a witness [25] and asked him about his investigation-what measurements did he take, to whom did he speak, what calculations did he perform,

---

21. *Id.* at 818–19.

22. *Kennedy*, 456 U.S. at 677 n. 7, 102 S.Ct. 2083.

23. *Peterson*, 117 S.W.3d at 819. As a caveat, however, this Court also noted, "Although reviewing courts should also grant deference to 'implicit factual findings' that support the trial court's ultimate ruling, they cannot do so if they are unable to determine from the record what the trial court's implied factual findings are." *Id.*

24. *Wheeler*, 146 S.W.3d at 249 ("We therefore conclude that the prosecutor's question was not only manifestly improper, just as the visiting trial judge had found, but also was the catalyst that provoked the mistrial").

25. Reasonable people might disagree about whether his specific employer-the defendant's insurance company-could be identified. That issue is not before us.

what opinions, if any, did he reach about the cause of the accident. But the insurance company's ultimate act of conceding liability is barely (if at all) probative of appellant's "fault" in causing the accident. And it is extremely prejudicial, likely to confuse and mislead the jury, and lead to time-consuming collateral litigation. This is precisely the type of evidence that TEX.R. EVID. 403 is designed to exclude.

The court of appeals also concluded that the visiting judge granted the mistrial because the prejudice produced from the prosecutor's improper question could not be cured by an instruction to disregard.[26] Again, we agree. This was, put charitably, a hair-raising question, and the visiting judge immediately recognized it as such. The defense did not even request a mistrial before the judge asked whether the defense wanted one. The judge reasonably concluded that once this skunk was in the jury box, there was no way to hide the smell. No instruction to disregard would still the reverberations ("even her own insurance carrier thought she was at fault; it wouldn't stick up for her"). This was a statement of fact, with a question mark appended at the end, which went to the very heart of the single, hotly disputed, issue in this trial. The court of appeals correctly concluded that the second prong of the *Peterson* test was met.[27]

 We part company with the court of appeals's analysis, however, on the third prong-whether the prosecutor asked this question with the intent to goad the defense into requesting a mistrial (*Kennedy*) or with conscious disregard of a substantial risk that the trial court would be required to grant a mistrial (*Bauder*).[28] On this third prong, the court of appeals failed to view the objective facts in the light most favorable to the trial judge's ruling. The court of appeals explicitly stated that it was employing a *de novo* review of the facts, rather than a deferential one, because the trial judge who conducted the habeas hearing was not the same judge who presided over the trial and granted the mistrial.[29]

 First, as a matter of law, reviewing courts defer to the trial court's implied

26. *Wheeler*, 146 S.W.3d at 250–51.

27. *See Wheeler*, 146 S.W.3d at 251 ("Under the objective facts and circumstances presented in this record, we conclude that no instruction could have cured the prejudice that must have flowed from the prosecutor's question revealing that appellant's own insurance company had found her at fault-again, the key issue of the case").

28. Because the resolution of this third prong does not depend upon any distinction between the federal (*Kennedy*) and state (*Bauder*) constitutional standards, we do not address the State's fifth ground which asks this Court to re-adopt the single standard articulated in *Kennedy*.

29. *Wheeler*, 146 S.W.3d at 246–47. The court of appeals explained:
In this case, neither party offered testimony on the merits of the petition at the habeas hearing; the parties had previously presented their arguments for and in opposition to granting a mistrial and dismissal with prejudice at the mistrial hearing held by the visiting judge. That judge granted appellant's motion, and the arguments and record from that hearing were offered into evidence at the writ hearing. However, the presiding judge, who ultimately heard the petition, was not the same judge who … presided over appellant's first trial and granted the mistrial. Thus, the trial court's rulings at the habeas hearing could not have turned on credibility and demeanor. Because the presiding judge who heard and ruled on the habeas petition was not in any better position to determine questions of fact and to apply the law to those facts than we would be, we will undertake a de novo review applying the new *Peterson* three-prong analysis.
*Id.* (footnote omitted).

factual findings that are supported by the record, even when no witnesses testify and all of the evidence is submitted in written affidavits.[30]

Second, in this case, the trial judge personally presided over the habeas hearing and was well-positioned to make credibility decisions. Although she did not preside over the underlying trial, at the writ hearing she stated that she had been in "daily" communication with the visiting judge. "I mean, I can't even begin to tell you how many times I talked to him during y'all's trial.... So I feel very comfortable that I understand the issues." She also said that the visiting judge left her a letter "stating the reasons for his rulings" and "some opinions that he seemed to have on the issue" at the writ hearing. Further, the trial prosecutor stood in front of her, and, while he did not formally testify, she quizzed him extensively concerning his reasons for asking the offending question. She could gauge his credibility and demeanor during this face-to-face colloquy.[31] She may have had prior knowledge of this prosecutor, and her assessment of his credibility could well be based upon those prior experiences as well as the cogency and genuineness of his explanation.

Third, the record shows that the trial judge did not make a hasty or ill-informed ruling. At the writ hearing, she had the transcripts of both the pertinent excerpts from the trial and the Monday mistrial hearing. She stated that she had also done some research on the double jeopardy issue, but she wanted to defer any ruling until she reviewed a transcript of the entirety of the defense expert's testimony, as well as any other testimony that either side thought important. This was a trial judge who was exercising her discretion carefully and cautiously, not one who was making an "off-the-cuff" ruling. Thus, she was the "Johnny–on–the–Spot" factfinder at the habeas hearing; this Court must view the objective facts in the light most favorable to her ruling[32] and uphold that ruling absent an abuse of discretion.

Here, the objective facts do not show that the trial judge abused her discretion in concluding that the prosecutor honestly (though misguidedly) thought that his question was permissible. We assess the

30. See, e.g., Charles v. State, 146 S.W.3d 204, 208 (Tex.Crim.App.2004) (reviewing courts "must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party" even when all evidence is submitted by affidavit); Manzi v. State, 88 S.W.3d 240, 244 (Tex.Crim. App.2002) ("Trial courts are the traditional finders of fact, and their determinations of historical fact are entitled to deference" even when the facts are in the form of an affidavit).

31. In Batson hearings, for example, the advocates rarely testify formally, yet appellate courts recognize that trial judges assess credibility as well as the accuracy and genuineness of the advocates' explanations. See Gibson v. State, 144 S.W.3d 530, 534 (Tex.Crim.App. 2004) (stating that "appellate courts must apply a 'clearly erroneous' standard of appellate review to a trial court's ruling on a Batson claim" because "the trial court is in the best position to determine whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral"); Jasper v. State, 61 S.W.3d 413, 421–22 (Tex. Crim.App.2001) (stating that the trial judge is in a unique position to determine whether a prosecutor exercised a peremptory challenge for race-neutral reasons, therefore the trial judge's decision is accorded great deference and will not be overturned unless it is clearly erroneous).

32. We note that neither the defense nor the State requested findings of fact. See, e.g., State v. Cullen, 195 S.W.3d 696, 699 (Tex. Crim.App.2006) (holding that "upon the request of the losing party on a motion to suppress evidence, the trial court shall state its essential findings").

objective facts in light of the six factors set out in *Peterson*.

### 1. Was the trial going badly for the State?

Both the State and the defense sponsored well-qualified, articulate expert witnesses. They came to opposing conclusions on the hotly disputed issue of who caused the accident: Ms. Wheeler or Dr. Mitchell. At the time of the mistrial, it was an evidentiary "neck-and-neck" horse race. However, at the mistrial motion hearing, the prosecutor stated that the insurance investigators were under subpoena and "we can bring them down here." Indeed it could and should have done so.[33] Then the State could have pointed to an independent expert-working for neither the State nor the defense attorney-who had reached the same factual conclusion (assuming that he did) as that reached by the State's expert.[34] This prosecutor was in an enviable evidentiary position. In fact, the visiting judge asked the prosecutor why he did not call the adjuster to testify to his investigation during the mistrial hearing, and the prosecutor responded, "That's one possible way." But then he argued, "As far as how I can prove it, I can prove it through asking questions of Mr. Westerlink [sic]."[35] On that score he was resoundingly wrong, but there is no indication that this was a trial that the prosecution was losing.[36]

Ms. Wheeler argues that the prosecutor "clearly saved the [offending] question for the very last instant. This was the last question, for the last witness, for the last day of trial. The timing of this question is proof that the prosecutor intentionally

33. What the prosecutor could have legitimately done is question Mr. Weckerling about the materials he reviewed and ask him whether he reviewed the report of "Mr. Whoozits" (who happens to be the insurance investigator). If he did not do so, thank him very much. Then call Mr. Whoozits in rebuttal and carefully walk him through his report. If the defense expert said that he had reviewed Mr. Whoozits's report but disagreed with it, thank him very much, and then call Mr. Whoozits in rebuttal and walk him through it. In either scenario, the defense expert has been effectively impeached, but without saying a word about Ms. Wheeler's insurance company or its ultimate decision to concede liability.

34. The defense had attacked the investigation conducted by the police, calling it "botched." The testimony of a "neutral" expert would have rehabilitated and reinforced the accuracy of the police investigation and of the State's expert.

35. Memories being what they are, both the prosecutor and the defense recalled some things inaccurately. The prosecutor apparently thought that Mr. Weckerling had said that he had reviewed the insurance adjuster's file. The witness said that he "knew" about some insurance material, but he did not say that he had "reviewed" an insurance report.

He relied upon the insurance adjuster's tape-recorded statement of Mr. West, but it is unclear whether he also knew that the recording was made by the insurance carrier. Meanwhile, the defense said that both it and the State had filed motions in limine barring any mention of insurance. In fact, neither had.

36. The court of appeals had concluded that the trial was going badly for the State because "the visiting judge had already notified that parties the day before the prosecutor asked the improper question that he was going to give the jury the 'concurrent cause' question. This question would ask who was at fault before even asking the jury whether appellant had the requisite mental intent required for conviction." 146 S.W.3d at 252. Once the issue became one of whose fault the accident was, a concurrent causation instruction would be appropriate and presumably helpful to the State. Although submission of a "concurrent cause" instruction might increase the prejudicial effect of the prosecutor's question, it has little relationship as to whether the prosecutor thought his case was going badly and therefore had to be resurrected with a manifestly improper question or had to be terminated with a mistrial.

saved this 'zinger' for last." Well, it was the last question of the trial since the trial ended because of this question, but no one knows what might have occurred had this question not been asked. Perhaps the State would have called the insurance adjuster to testify to his investigation. Furthermore, the record does not support any suggestion that the State "saved" this "zinger" question. It had ended its initial cross-examination of Mr. Weckerling without asking this question, and it could not predict whether the defense would re-direct. It had ended its re-cross-examination of Mr. Weckerling without asking this question, and, again, it could not predict whether the defense would re-re-direct. It was only when the defense asked its summing-up question, including a reference to "all" of the materials that Mr. Weckerling had reviewed, that the State, on its third cross-examination, asked its fatal question. In context, the prosecutor appears more rash than Machiavellian.

## 2. Did the State repeat its misconduct despite admonitions from the Court?

This factor focuses on the wilfulness of repeated misconduct by the prosecutor. There was no repeated misconduct. Ms. Wheeler argues that the prosecutor violated its own motion in limine by asking this question and that conduct shows wilfulness. But the State's motion in limine barred only the mention of a "monetary settlement," not any mention of an insurance carrier's investigation. The defense had filed a motion in limine barring "[a]ny statements of any witness that the defendant is guilty of any offense being tried,"

and that motion, though close, is not a clear reference to the insurance carrier's finding of "fault." Furthermore, a single violation of a motion in limine is insufficient to show repeated, wilful violations made despite judicial admonitions.

## 3. Did the prosecutor provide a reasonable "good faith" explanation for the conduct?

At the mistrial hearing, the prosecutor offered two explanations for his question: First, he thought (incorrectly) that Mr. Weckerling "had seen the materials from an insurance investigation," thus "this issue is already before the jury as to an insurance investigation." Second, he noted that

> the last question by defense counsel prior to passing a witness for recross [was] in reference to causation and fault of the victim. I certainly think it is fair impeachment of any expert who comes in here and gives an opinion as to, one, things they have reviewed, and, two, things they have reviewed that are contrary.... First of all, I did ask him did he review material from insurance investigations. He said he looked at it; therefore, anything he's looked at is open for me to impeach him or cross-exam him on. The rules specifically allow for that.

There is no indication anywhere in the record that the prosecutor did not sincerely, but mistakenly, believe that Mr. Weckerling had, in fact, reviewed the insurance report.[37] The prosecutor repeatedly explained, both at the mistrial hearing and at the writ hearing, that he based his ques-

---

**37.** When the prosecutor asked Mr. Weckerling if he had reviewed "other investigations by an insurance company or other individuals," the witness said, "I think there is something in there, but I have not reviewed that." At the writ hearing, the defense explained that his expert "did not have any conclusions of the insurance" report because "we did not give them, the witness, that particular file." The fact that the defense expert did not have access to all of the pertinent existing investigative reports is, of course, a fair topic for impeachment.

tion upon this fact. It turns out that this "fact" is wrong. The prosecutor may have misheard the witness or confused the testimony of his own expert (who had reviewed the insurance investigation report) with that of the defense, but that does not make him either wilful or reckless. Of course, even if Mr. Weckerling had reviewed the entire file, the prosecutor could not ask the precise question that he did ask, but he could have asked about specific facts and data, calculations, and whether and why the defense expert thought the other investigator's opinion about the cause of the accident was inaccurate.

The court of appeals stated that, toward the end of the mistrial hearing, the visiting judge asked the prosecutor why he had asked that particular question, and the prosecutor responded, "Judge, I got to ask it sometime." [38] Only those present in the courtroom at the time could determine whether this statement was made in a flippant or earnest manner, but, on its face, the statement suggests that the prosecutor thought his was a proper question. At any rate, this ambiguous response came long after the prosecutor had explained his reasons for the question.

### 4. Was the conduct "clearly erroneous"?

The prosecutor's question brought an immediate halt to the proceedings. There seems no doubt that the visiting judge instantly thought it was a "clearly erroneous" question that could not be cured by an instruction to disregard. There seems little doubt that the trial judge also thought this question was "clearly erroneous," and during the writ hearing she was simply seeking an explanation from the prosecutor as to his reasoning for asking the question. Although the prosecutor, defense attorney, and trial judge all focused on whether the question was prohibited or allowable under Rule 411 of the Texas Rules of Evidence, that rule does not really speak to the propriety of the question.

Rule 411 prohibits the parties from inquiring about the *existence* of insurance offered to show that the insured was negligent or otherwise at fault.[39] The prohibited inferences are that (1) one who has insurance is more likely than others to be negligent because he is protected by insurance; and (2) an insurer has "deep pockets" and thus could afford to pay any judgment against its insured.[40] The prosecutor's question did not go to the existence of insurance (a fact that had been mentioned several times during this trial), but rather to the insurance carrier's apparent ultimate decision to accept fault by its insured, Ms. Wheeler. Thus, the prosecutor was technically correct that Rule 411 would not directly bar his questioning, but his question was far more prejudicial (and more misleading) than any mere mention of the existence of insurance as proof of Ms. Wheeler's negligence or fault. The question stated the result of an insurance investigation and the conclusion that Ms. Wheeler's own agent, her insurance carrier, had conceded her "fault." Thus, the question was outside Rule 411, but even

---

**38.** *Wheeler,* 146 S.W.3d at 252.

**39.** *See* Fed.R.Evid. 411, advisory committee note; Stephen A. Saltzburg, et. al. Commentary, Fed.R.Evid. 411.

**40.** *See generally* 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 153 at 176 (2d ed.1994) (setting out both the relevance theory of insurance inclining a party toward negligence and the prejudice theory that juries will be more likely to find liability because of insurance coverage); *see also AcuBanc Mortgage Corp. v. Drummonds,* 938 S.W.2d 135, 151–52 (Tex.App.-Fort Worth 1996, writ denied).

more prejudicial than the questioning that is prohibited by that rule.

### 5. Was there a plausible basis for the prosecutor's conduct?

There was, as discussed above, a very reasonable basis for asking Mr. Weckerling whether he had reviewed any expert investigations or reports other than the one prepared by the police. There was a plausible basis for cross-examining him on the importance of reviewing all materials and sources connected to an accident investigation before reaching an opinion. This was a fruitful area of impeachment, and the State could have then called the "other" investigator during rebuttal to discuss his underlying data and opinion on the cause of the accident. Thus, the area of inquiry was entirely appropriate, but the specific question actually asked by the prosecutor was entirely inappropriate.

### 6. Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment or negligence, or were they consistent with intentional or reckless misconduct?

This was a hotly contested trial and, given its duration and various contretemps between the advocates, tempers were hot on both sides. As the visiting judge plaintively concluded, both sides acted "playgroundish." The objective record bears out this assessment. Both the State and defense were very zealous in putting forward their respective factual and legal positions. The advocates clashed repeatedly. The visiting judge assessed no intentional or reckless fault against either side, but he might well have taken into account the rising tempers and trial fatigue by both sides as contributing to the prosecutor's final, fatal question.

### IV.

In sum, we agree with the court of appeals that the visiting judge did not abuse his discretion in granting the mistrial when the prosecutor asked a manifestly improper question.[41] But, viewing the objective facts in the light most favorable to the trial judge's ruling, we cannot say that the trial judge abused her discretion in denying relief on Ms. Wheeler's double-jeopardy claim. Factually, this is a close case, and, had the trial judge ruled that double jeopardy *did* bar any retrial, we would, of course, uphold that ruling as well. Rational people can differ about whether, given these facts, it is a reasonable inference that the prosecutor was intentionally goading the defense into asking for a mistrial (the federal *Kennedy*[42] standard) or acting with conscious disregard of a substantial risk that the trial court would be required to declare a mistrial (the state *Peterson/Bauder*[43] standard). That is precisely why we, as a reviewing court, must defer to the trial judge's factfinding.

From all appearances, the prosecutor could well have thought that the trial was going fine. It is reasonable to conclude that he was, in his own mind, just giving the *coup de grace* to the defense expert. We cannot disagree with the trial judge's implicit conclusion that this was a question that was asked in good faith, albeit an impetuous, perhaps even stupid, question.

**41.** 146 S.W.3d at 253.

**42.** *Kennedy,* 456 U.S. at 673, 102 S.Ct. 2083 (explaining that the "intentional goading" standard was designed to protect a defendant whose motion for mistrial could not fairly be considered a result of his own free will; "in such a case, the defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances").

**43.** *Ex parte Peterson,* 117 S.W.3d at 817.

The trial judge saw the prosecutor and could judge his credibility and integrity; she was entitled to conclude that the prosecutor acted with unwarranted zeal rather than malice or reckless disregard for the defendant's rights. We cannot say that the trial judge abused her discretion in finding that neither *Kennedy* nor *Peterson* would bar the defendant's retrial.

We therefore reverse the judgment of the court of appeals and remand this case to the trial court for further proceedings.

KELLER, P.J., filed a concurring opinion.

KEASLER, J., filed a concurring opinion, in which KELLER, P.J., and HERVEY, J., joined.

KELLER, P.J., filed a concurring opinion.

I join the Court's opinion to the extent that it holds that appellant fails the third prong of the *Peterson*[1] test, because the habeas trial court was within its discretion to believe that the prosecutor did not act intentionally or recklessly with respect to the mistrial. I disagree, however, with the Court's conclusions regarding the first two prongs of the *Peterson* test. The prosecutor's conduct was not manifestly improper and any alleged error was curable.

*Peterson* dictates that the impropriety be "manifest," and the manifest nature of the impropriety is judged from an objective standpoint.[2] In this vein, we noted that when "the law itself is unsettled or application of the law in the particular situation is debatable, the prosecutor's conduct cannot be said to be manifestly improper."[3]

The Court acknowledges that there was no violation of Rule 411.[4] Rule 411 prohibits only evidence of the *fact* of insurance and does not operate to prevent evidence of an insurance investigation or the conclusions derived from such an investigation.[5] Appellant's possession of liability insurance had already been revealed to the jury, without objection, and in fact, that information is not likely to have made any particular impression on the jurors because automobile liability insurance is required by law.

There are also at least some good arguments for admitting, under the hearsay rule, the evidence sought by the disputed question. The insurance company's admission of fault appears to be a statement against interest.[6] Even if it were not, this type of evidence appears to be admissible—as the Court suggests—to impeach the defendant's expert witness.[7]

---

**1.** 117 S.W.3d 804 (Tex.Crim.App.2003).

**2.** *Id.* at 816 n. 55.

**3.** *Id.*

**4.** Rule 411 provides:
Evidence that a person was or was not insured against liability is not admissible upon the issue of whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another issue, such as proof of agency, ownership or control, if disputed, or bias or prejudice of a witness.

**5.** *See* Advisory Committee's Note, FED.R.EVID. 411; Stephen A. Saltzburg, Daniel J. Capra,

and Michael H. Martin, Commentary, FED. R.EVID. 411 (U.S.C.S.).

**6.** A statement against interest includes, among other things, a "statement which was at the time of its making so far contrary to the declarant's pecuniary ... interest, or so far tended to subject the declarant to civil ... liability, ... that a reasonable person in declarant's position would not have made the statement unless believing it to be true." TEX.R. EVID. 803(24).

**7.** *Ramirez v. State*, 815 S.W.2d 636, 651 (Tex. Crim.App.1991)(learned treatise not relied upon by expert witness may be admissible "to demonstrate any deficiency in the expert's

The Court says that the State's question was a violation of Rule 403 [8] because it was unfairly prejudicial. Most commonly, an unfair prejudice claim flows from the admission of evidence for a limited purpose under some *other* evidentiary rule, such as Rule 404(b),[9] *and the question is whether the probative value of the evidence to show a limited purpose (e.g. motive) outweighs the prejudice flowing from the improper purpose the other rule of evidence is designed to protect against (e.g. character conformity).*[10] But the Court does not claim that appellant suffered any prejudice emanating from Rule 411, Rule 801 (hearsay), or any other rule. Rather, the Court reaches a generalized "unfair prejudice" conclusion without citing any Texas cases for support. I cannot agree that the prosecutor's conduct, under those circumstances, can accurately be characterized as *manifestly* improper.

The Court claims that an insurance carrier might have any number of reasons to admit fault, but that is difficult to imagine. Insurance companies rarely ever admit fault, even when they settle. Moreover, it is not clear from the record where and how this admission of fault was made.

The "admission of fault" may simply be the conclusion made by the insurance company adjustor at the end of his investigation. It was the defendant's burden to show otherwise at the habeas hearing, and he did not attempt to do so.

Finally, any error associated with the question could have been cured by requiring the State to bring the insurance witnesses into court to testify, as the State claimed it was ready to do. Any admission of fault abstractly made by the insurance company (if such were even the case) could then be placed in its proper context. The investigator's association with the defendant's insurance company would be a fact relevant to assessing the credibility of his testimony and of the investigation in general.

KEASLER, J., filed this concurring opinion joined by KELLER, P.J., and HERVEY, J.

Once again the majority has refused to address whether *Bauder*[1] and its progeny should be overruled even though the issue is before us. The State's fifth ground for review provides: "Should this Court re-adopt the standard of review articulated in *Oregon v. Kennedy?* "[2] The majority con-

---

knowledge and to help the jury determine the weight to be given the testimony"); Michael H. Graham, EVIDENCE: TEXT, RULES, ILLUSTRATIONS, PROBLEMS, Revised 2nd Ed., 274–275 (1989) ("facts, data, or opinions" not relied upon by expert witness may be admissible to test "qualifications, knowledge, fairness, and basis of the expert's opinion"). *See also Moranza v. State*, 913 S.W.2d 718, 726–727 (Tex. App.-Waco 1995, pet. ref'd)(expert witness that relied upon a report properly impeached with missing portion that was not relied upon).

8. Rule 403 provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

or needless presentation of cumulative evidence.

9. Rule 404(b) provides in relevant part:

 Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

10. *See*, for example, *Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App.1991).

1. 921 S.W.2d 696 (Tex.Crim.App.1996).

2. 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

cludes that "[b]ecause the resolution of this third prong [of the three-part *Peterson*[3] test] does not depend upon any distinction between the federal (*Kennedy*) and state (*Bauder*) constitutional standards, we do not address the State's fifth ground which asks this Court to re-adopt the single standard articulated in *Kennedy*."[4] The third part of the *Peterson* test asks: "Did the prosecutor engage in that conduct with the intent to goad the defendant into requesting a mistrial (*Kennedy* standard) or with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial (*Bauder* standard)?"[5] Because the third part of the test includes the application of the *Bauder* standard, the resolution of the third part of the *Peterson* test does depend on the distinction between the federal and state constitutional standards. This is clear from the majority's conclusion that "We cannot say that the trial judge abused her discretion in finding that neither *Kennedy* nor *Peterson* would bar the defendant's retrial."[6] Perhaps the majority means to say that because the outcome is the same regardless of which standard, state or federal, is applied, there is no need to address the State's fifth ground for review. That rationale, however, provides a weak excuse for the Court's decision to adhere to the *Bauder/Peterson* standard. So while I concur in the result reached by the majority, as I have previously maintained in my concurring opinion in *State v. Lee*,[7] and in my dissent *Ex parte Peterson*,[8] *Bauder* and its progeny

should be overruled—we should "return to the standard forth by the Supreme Court ... in *Oregon v. Kennedy* [,]"[9] and followed by almost all other jurisdictions.[10]

---

3. 117 S.W.3d 804, 817 (Tex.Crim.App.2003).

4. *Ante*, op. at 325 n. 28.

5. 117 S.W.3d at 817.

6. *Ante,* op. at 331.

7. 15 S.W.3d 921, 931 (Tex.Crim.App.2000).

8. 117 S.W.3d at 820–21 (Tex.Crim.App.2003) (Keasler, J., dissenting); *see also id.* at 821–31 (Hervey, J., dissenting, joined by Keller, PJ., and Keasler, J.).

9. *Lee,* 15 S.W.3d at 930–31 (Keasler, J., concurring).

10. *Id.* at 929–30 (Keasler, J., concurring).