COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| | § | No. 08-22-00096-CR |
| EX PARTE: MOISES GALVAN, | § | Appeal from the |
| | § | 168th Judicial District Court |
| | § | of El Paso County, Texas |
| | § | (TC#20170D00969) |

## OPINION

The State charged Appellant Moises Galvan with murder and aggravated assault with a deadly weapon over five years ago. Near the conclusion of his first trial in 2019, the trial court granted Galvan's motion for a mistrial after the State asked him a question on cross-examination that introduced a hearsay statement. Almost three years later, Galvan filed an application for a writ of habeas corpus asking the trial court to dismiss the indictment as barred by the Fifth Amendment's Double Jeopardy Clause. The trial court denied Galvan's application. We affirm.

## BACKGROUND

### 1. Factual Background

A grand jury indicted Galvan for a January 29, 2017, shooting that resulted in bodily injury to David Ortega and the death of Rogelio Franco. During a jury trial that lasted over three weeks

in May and June 2019, the State introduced evidence showing that Galvan shot both Ortega and Franco outside of an El Paso, Texas bar called Bar Fly. In addition to video footage from nearby security cameras, the State offered evidence through the testimony of over twenty witnesses. Amongst these witnesses was Ramon Solano—an acquaintance of Galvan that was at the Bar Fly on January 29—who testified he saw Galvan yelling derogatory terms at Franco before the shooting. Solano indicated he followed Galvan, Franco, and Ortega out of the bar because he thought there was going to be a fistfight. He testified that once outside of the bar he did not see Galvan fight with or take a weapon from anybody. While Solano did not testify to who fired the gun on January 29, he did state he ran away from the area because he heard gunshots. The State also offered testimony from an off-duty deputy sheriff working security at Bar Fly who watched Galvan run from the scene after the gun shots with a dark object in his hand. After detaining Galvan, the deputy sheriff found a handgun under a car Galvan had run by. The gun was later recovered by an El Paso Police Department crime scene unit officer who identified it at trial as a Ruger handgun. Expert testimony showed the bullets recovered from Franco's body were shot by the Ruger handgun found under the car. Further, DNA evidence extracted from the pistol grip of the Ruger was consistent with Galvan, but excluded Ortega and Franco.

The State also presented the testimony of Ortega. Ortega testified that neither he nor Franco had a firearm with them on January 29. He also testified that after Galvan approached Franco in the Bar Fly, they all proceeded outside. At no point, according to Ortega, was there any kind of scuffle between him and Galvan. But, almost as soon as they were outside, Ortega testified he heard gun shots and saw flashes coming from Galvan's hand. Ortega told the jury that as soon as he heard the gun shots, he ran towards Franco, at which time Galvan shot him in the chest. Ortega spent the next week in the hospital recovering from gun shot wounds.

After the State rested, Galvan admitted he shot Franco and Ortega, but claimed he did it in self-defense. Galvan testified that in 2013 a group of men, which included Franco, beat him and stabbed him. He also stated that Franco continued to threaten him at the gym and then beat him and his cousin up at a bar in 2016 because Franco thought Galvan was looking at his girlfriend. Galvan introduced testimony from his cousin, Rudy Galvan, and a friend to corroborate his story about being beaten up by Franco at a bar.

Galvan testified that on January 29, 2017, he went to the Bar Fly with his girlfriend Roxy, Raymond Solano, and Roxy's brother Luis Ruiz. Galvan stated he noticed Franco and Ortega in Bar Fly and tried to leave with Roxy. Franco, according to Galvan's testimony, told him "[y]ou're not going nowhere, bitch" and flicked a lit cigarette onto his face. Galvan testified that Franco and Ortega then followed him out of the bar where he heard Ortega say "[i]ts loaded. It's loaded. Let's fucking get him." He then felt Ortega extend his arm and place a "dark object on [Galvan's] chest." Galvan told the jury at this point he was extremely scared, so he grabbed the gun from Ortega and pointed it in the direction of both Franco and Ortega and started shooting.

The direct and cross-examinations of Galvan proceeded over several days. To accommodate witnesses' schedules, the trial court allowed the State to call two of its rebuttal witnesses in the middle of Galvan's testimony. One of the rebuttal witnesses the State called was Luis Ruiz, who was at Bar Fly with Galvan the night of the shooting. Ruiz, however, refused to testify under the Fifth Amendment's protection against self incrimination. But the trial court adjourned the trial for the day, which allowed the State to discuss Ruiz's availability to testify with his attorney. The next day at trial, the State argued to the trial court that Ruiz should be required to testify because it was granting him immunity from prosecution based on his testimony. The State also argued its grant of immunity to Ruiz would prohibit the federal government from

3

prosecuting him for any federal crimes he implicated himself in. The trial court did not rule on whether it would require Ruiz to testify under a grant of immunity.

The direct and cross-examinations of Galvan then continued. During its cross-examination, the State asked the following question:

> Q. (By Ms. Scofield) The truth of the matter is when you told Detective Camacho you didn't want to go to prison that's because you knew you had murdered somebody and you were going to prison in that interview, isn't it?

Galvan's attorneys objected to the question as argumentative and asked the trial court to "order this prosecutor to stop saying murder." The trial court sustained Galvan's objection and admonished the State's attorney she was "including argumentative comments to compound your questions and [it was] going to start stopping that" going forward. The trial court went on to tell the State's attorney to "please ask direct proper questions." Eight questions later, the following sequence that led the trial court to grant a mistrial took place:

Q. So your friend, Luiz Ruiz, was out there in the parking lot with you, was he not?

A. Yes, ma'am.

Q. And your friend, Luis Ruiz, has said that you always carry a black 38 Ruger in your pocket?

MR. MACIAS: Objection, Your Honor. Where is this coming from? First of all, it's hearsay.

THE COURT: Okay. Hold on. You are to disregard that question. I'm going to allow you to go out right now, except I want to know one thing from the prosecutor.

MS. SCOFIELD: Yes, sir.

THE COURT: So another person said this and you're bringing this out as a question to him? Is that correct?

MS. SCOFIELD: I can rephrase it.

THE COURT: No, no, no.

4

MS. SCOFIELD: Okay.

.    .    .

THE COURT: I don't understand why you would bring a statement like that involving the gun – whether it's true or not, okay, that another person said about him out of the blue on his cross-examination. And I know you to be a very competent lawyer. I would say that you would know better that you want to get this out in front of the jurors.

MS. SCOFIELD: I think it's relevant that he's known to carry a black 380 Ruger.

THE COURT: Well, then prove it the right way. If I even allow it from him as a matter that you could ask him a question about with respect to me doing that relevancy analysis.

MS. SCOFIELD: Okay. Judge, I will.

THE COURT: Prove it the right way.

MS. SCOFIELD: All right. I will, sir.

Galvan then asked the trial court to grant a mistrial based on prosecutorial misconduct. He argued the State was goading him into asking for a mistrial because it needed more time to get Ruiz to testify. The State answered it did not need additional time to prepare for the trial. The trial court responded by saying it believed it had ruled that Ruiz's testimony was not allowed to come in, and the trial was going to be in recess so the court reporter could find his ruling in the record. After the recess, the trial court held the prosecutor "in summary contempt of court," fined her $100, and adjourned the trial for the day.

## 2. Procedural Background

### a. Mistrial Order

Galvan's trial never resumed. On June 3, 2019, the trial court issued an order granting Galvan's motion for a mistrial. In its order, the trial court stated the State's "question was clearly

5

objectionable, and the leading question statement contained in the query was clearly and extremely prejudicial" to Galvan. The question, according to the trial court, was so egregious and obviously improper "that it caused disturbance of the proceedings and rose to the level of disrespect to the trial court." The trial court also stated the State's motivation in asking the question was to get Ruiz's testimony into evidence "through the back door" before the trial ended. It went on to state it had excluded a hearsay statement of Ruiz offered by the State earlier in the trial as an excited utterance. The statement offered as an excited utterance, however, was the witness heard Ruiz tell Roxy that Galvan had just shot someone. It did not have anything to do with Ruiz saying Galvan regularly carried a firearm. The trial court's order also described the complications regarding Ruiz's testimony, but it did not say it had ruled that Ruiz's testimony would not be allowed. Finally, the trial court expressly stated it was not ruling on Galvan's assertion the mistrial was intentionally caused by the State: "[T]he defense is asking that the mistrial be attributed to prosecutorial misconduct. This mistrial order is not a proper vehicle, nor is this the proper time, for the Court to make conclusory assessments in this case, other than those set out."

### b.  Motion to Recuse

The State filed a motion to recuse the presiding trial court judge because numerous complaints had been filed against the judge with the Texas State Commission on Judicial Conduct alleging misconduct related to Galvan's trial. After the presiding trial court judge declined to voluntarily recuse himself, the regional presiding judge held a hearing and granted the State's motion to recuse because the presiding trial court judge had "potentially become a witness in the case."

### c.  Application for a writ of habeas corpus

Galvan filed an application for a writ of habeas corpus after a new trial court judge was assigned. In his application, Galvan argued that retrying him for the January 29, 2017, shooting of Ortega and Franco is barred by the Fifth Amendment's Double Jeopardy Clause because his first trial ended in a mistrial because of misconduct by the State. Specifically, he claimed the State was attempting to get Ruiz's testimony in through the backdoor after he claimed his Fifth Amendment privilege against self-incrimination and was not available to testify. Galvan also asserted "the trial court appears to agree that the prosecutor did intend her conduct to provoke [Galvan] into moving for a mistrial" because it held her in summary contempt of court.

After holding an evidentiary hearing in which it did not consider any live testimony, the trial court issued an order deny Galvan's application for a writ of habeas corpus.

This appeal followed.

## ISSUES ON APPEAL

The only issue before the Court is whether the trial court erred by denying Galvan's application for a writ of habeas corpus on the basis the Fifth Amendment's Double Jeopardy Clause does not bar the State from retrying him for January 29, 2017 shooting of Ortega and Franco.

## STANDARD OF REVIEW

Generally, a trial court's order denying habeas corpus will be upheld absent an abuse of discretion. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex.Crim.App. 2006). In reviewing a trial court's decision to deny habeas corpus relief, we review the evidence in the light most favorable to the trial court's ruling and defer to the determinations of historical fact that are supported by the record, even when no witnesses testify. *Id.* at 324–26; *see also Ex parte Masonheimer*, 220 S.W.3d

7

494, 507 (Tex.Crim.App. 2007). We review *de novo* the application of the law to the facts found by the trial court. *State v. Moff*, 154 S.W.3d 599, 601 (Tex.Crim.App. 2004).

## ANALYSIS

### 1. Applicable Law

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. U.S. CONST. art. V; *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982); *Ex parte Ahn*, No. 08-14-00082-CR, 2015 WL 4940053, at *1 (Tex.App.—El Paso Aug. 19, 2015, no pet.)(not designated for publication). "There are few if any rules of criminal procedure clearer than the rule that 'jeopardy attaches when the jury is empaneled and sworn.'" *Martinez v. Illinois*, 572 U.S. 833, 839 (2014)(quoting *Crist v. Bretz*, 437 U.S. 28, 35 (1978)). Consequently, the State is generally entitled to only one opportunity to have the defendant stand trial. *Arizona v. Washington*, 434 U.S. 497, 505 (1978). Double jeopardy does not, however, generally bar retrial when a mistrial is granted at the defendant's request. *Kennedy*, 456 U.S. at 672–73; *Ahn*, 2015 WL 4940053, at *1. The one exception to this rule recognized by the United States Supreme Court is the Double Jeopardy Clause will bar retrial if the defendant is able to show the prosecution engaged in conduct intended to provoke the defendant into moving for a mistrial. *Kennedy*, 456 U.S. at 679; *Ahn*, 2015 WL 4940053, at *1.

Texas used to have a broader view of this exception and barred retrial if the defense could show the prosecutor was aware of, but consciously disregarded the risk his conduct would require a mistrial at the defendant's request. *Bauder v. State*, 921 S.W.2d 696 (Tex.Crim.App. 1996), *overruled by Ex parte Lewis*, 219 S.W.3d 335 (Tex.Crim.App. 2007); *Ahn*, 2015 WL 4940053, at *1. But the Texas Court of Criminal Appeals overruled its *Bauder* decision in *Lewis* and adopted the United States Supreme Court's standard. *Id.* The specific intent exception has been described

8

by the Supreme Court and the Court of Criminal Appeals as a narrow one. *Kennedy*, 456 U.S. at 673; *Masonheimer*, 220 S.W.3d at 506; *see also Ahn*, 2015 WL 4940053, at *1.

To come within this narrow exception, a habeas corpus applicant must prove his double jeopardy claim by a preponderance of the evidence. *Ahn*, 2015 WL 4940053, at *2; *see Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex.Crim.App. 1995). The Court of Criminal Appeals has set out a non-exclusive list of objective factors for courts to consider in analyzing whether the State acted with the specific intent of provoking the defendant into moving for a mistrial:

> 1)      Was the misconduct a reaction to abort a trial that was 'going badly for the State?' In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?
>
> 2)      Was the misconduct repeated despite admonitions from the trial court?
>
> 3)      Did the prosecutor provide a reasonable, 'good faith' explanation for the conduct?
>
> 4)      Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?
>
> 5)      Was the conduct 'clearly erroneous'?
>
> 6)      Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

*Wheeler*, 203 S.W.3d at 323–24; *Ahn*, 2015 WL 4940053, at *6.[1]

### 2. Discussion

Galvan does not expressly discuss any of the above factors in support of his appeal. Instead, he summarily concludes "that the State's actions were calculated to such a degree that retrial should, under constitutional protections, be barred under the 5th Amendment to the Federal

---

[1] As we recognized in *Ahn*, *Ex parte Wheeler* "is a pre-*Ex parte Lewis* case, but these factors were set out to assist in deciding claims under either the federal or state constitutional guarantees against double jeopardy and would still apply to the *Oregon v. Kennedy* analysis." 2015 WL 4940053, at *6 n.4.

Constitution." He also concludes—without providing any argument or authority—that the "State's question was manifestly improper." The only evidence he cites to show the State acted with the requisite intent is that Ruiz had just invoked his Fifth Amendment right and the trial court "*appears to agree that the prosecutor did intend her conduct to provoke*" Galvan into moving for a mistrial because it held her in "summary contempt of court." The trial court, however, expressly stated in its mistrial order it was not deciding the intent issue. As the party with the burden of proving by a preponderance of the evidence the prosecutor acted with the specific intent of forcing him to ask for a mistrial, Galvan's unsupported conclusions are insufficient to convince us the trial court abused its discretion in denying his application for a writ of habeas corpus. Nevertheless, our independent review of the record shows the *Wheeler* factors support the trial court's finding the State was not intentionally engineering a mistrial.

### a. Was the case going badly for the State?

Galvan insinuates in his brief the case was going poorly for the State because its plan to discredit Galvan's self-defense argument through Ruiz's testimony was upended when Ruiz asserted his Fifth Amendment right against self incrimination. As an initial matter, the question regarding Ruiz's availability to testify had not been decided at the time Galvan's motion for a mistrial was granted. While Ruiz had refused to testify, the State was asking the trial court to require his testimony based on a grant of immunity. And the trial court did not rule on the State's request before it granted a mistrial. Consequently, Galvan's argument that Ruiz was not available to testify is not supported by the record.

The State argues in its brief it had presented significant evidence proving Galvan's guilt. Viewing the facts in the light most favorable to the trial court's denial of habeas corpus, as we must, we agree with the State. Galvan admitted shooting both Ortega and Franco. While he claimed

he took the gun from Ortega and shot it in self-defense, the State presented evidence contradicting Galvan's story. Galvan's acquaintance, Ramon Solano, for example, testified he did not see Galvan struggle with anybody before he heard the gunshots. Ortega also testified he did not have a gun on the night of the shooting and he did not struggle with Galvan before he was shot. Further, DNA evidence indicating that Galvan—and not Ortega or Franco—had handled the gun supports Ortega's version of events. Consequently, while Ruiz potentially not being available to testify for the State was a setback, the record as a whole does not compel a finding the State's case was going so poorly it wanted to prompt a mistrial.

> b.  *Was the misconduct repeated despite admonitions from the trial court?*

During the evidentiary hearing, Galvan argued to the trial court the State had been told not to ask about Ruiz's statement about Galvan carrying a gun. He abandons that position on appeal, as he must. Nowhere in the record does the trial court admonish the State to stay away from the subject.

> c.  *Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence verses intentional misconduct?*

The State argues "the phrasing of the prosecutor's question was, at most, inartful." Instead of asking Galvan about something Ruiz said, according to the State, the prosecutor should have asked Galvan whether he is known to regularly carry a firearm. We agree.

The record shows the trial to have been contentious. In the over three week trial, it was rare for more than a handful of questions to pass without one of the parties raising an objection. And many of the defense's objections regarding the prosecutor's direct and cross-examinations were sustained by the trial court. Indeed, just a few questions before the trial was terminated the trial court granted the defense's objection about the prosecutor asking argumentative and compound

11

questions and told the prosecutor to "please ask direct proper questions." This supports the State's position the prosecutor's improper questioning of Galvan, while inartful, was unintentional.

        *d. Did the prosecutor provide a reasonable good faith explanation for the conduct? Was the conduct 'clearly erroneous?' Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?*

Combining the last several factors, the State appears to concede, and we agree, that it was erroneous for the prosecutor to ask a question including hearsay that was inadmissible under Texas Rule of Evidence 802. Galvan, however, had testified he took the gun from Ortega and shot it in self defense. Immediately after the defense's objection, the prosecutor explained she asked the question about Ruiz' out-of-court statement because she thought it was relevant to rebut Galvan's theory of the case by showing "that [Galvan] is known to carry a black 380 Ruger." And, as previously mentioned, had she phrased it differently, the question would have been proper. Further, if Galvan had denied regularly carrying a firearm, the State would have had the opportunity to impeach him with contradictory evidence. *See Pena v. State*, No. 08-16-00236-CR, 2019 WL 1374152, at *13 (Tex.App.—El Paso Mar. 27, 2019, pet. ref'd)(not designated for publication). This evidence may have included testimony from Ruiz, which, as discussed, had not been ruled out at the time the mistrial was granted.

## CONCLUSION

In short, Galvan carries the burden of proving entitlement to habeas relief. *See Ahn*, 2015 WL 4940053, at *2. He has not carried his burden. As a result, we overrule Issue Number One because the trial court did not abuse its discretion in denying Galvan's application for a writ of habeas corpus. The trial court's order is, therefore, affirmed.

                    YVONNE T. RODRIGUEZ, Chief Justice

November 2, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)