IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1216-04






Ex parte KRISTIN HOPE WHEELER, Applicant






ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


TARRANT COUNTY





 Cochran, J., delivered the opinion of the Court, in which Meyers,
Price, Womack, Johnson, and Holcomb, JJ., joined. Keller, P.J., filed a
concurring opinion. Keasler, J., filed a concurring opinion, in which Keller, P.J.,
and Hervey, J., joined.


O P I N I O N 



 In this manslaughter/criminally negligent homicide trial, the visiting judge granted a
defense-requested mistrial when the prosecutor asked the defendant's expert, "Are you aware
that her [the defendant's] insurance carrier found her at fault?" The defendant then filed a
habeas corpus application, claiming that a second trial was barred by federal and Texas
constitutional double-jeopardy principles. The trial court denied relief. The court of appeals
held that "the prosecutor intentionally or recklessly caused the trial to end in a mistrial," so
it reversed the trial court and dismissed the case with prejudice. (1) We conclude that the court
of appeals misapplied the standard of review by failing to assess the objective facts "in the
light most favorable to the trial judge's ruling." (2) Under that standard, the trial judge did not
abuse her discretion in denying Ms. Wheeler's double-jeopardy claim. We therefore reverse
the judgment of the court of appeals and remand this case for further proceedings in the trial
court.

I.


 On the afternoon of July 21, 1999, Herman West was driving down a rural road in
southwest Tarrant County when he saw Dr. David Mitchell standing near the rear of his
parked truck, ready to walk across the road to his mailbox. A few seconds later, Mr. West
saw a white Ford Mustang pass him in the opposite direction. Eighteen-year-old Kristin
Wheeler was driving that Mustang. Mr. West heard the squeal of brakes, and, looking in his
rear-view mirror, saw Dr. Mitchell flying through the air above the Mustang. He
immediately turned his truck around and drove back to the accident scene. Dr. Mitchell later
died from his injuries, and Ms. Wheeler was charged with manslaughter and criminally
negligent homicide. The primary contested issue at trial was, "Who was at fault in causing
this accident and Dr. Mitchell's death?" The State's theory was that Ms. Wheeler caused the
accident because she was speeding and failed to exercise proper control of her car. The
defense theory was that Dr. Mitchell failed to look before he walked into the road, and he
failed to yield the right-of-way to the oncoming car. The trial was a battle between the State
and defense accident-reconstruction experts. 

 After the State put on its case-in-chief, the defense called Alan B. Weckerling, an
expert in accident-reconstruction analysis. His measurements, calculations, methodology,
and conclusions differed significantly from those offered by Tim Lovett, a certified peace
officer and the State's expert accident investigator who had testified extensively over four
different days. (3) Much of Mr. Weckerling's opinion was based on a tape-recorded statement
given by Mr. West a few days after the accident. This tape recording of Mr. West's
eyewitness account and his actions immediately after the accident was played to the jury. 
What the attorneys knew, but the jury apparently did not, was that the tape recording had
been made by Ms. Wheeler's insurance adjuster, who conducted his own investigation of the
accident. Based on Mr. West's recorded recollection of time, distance, and other factors, Mr.
Weckerling concluded that it would not have mattered whether Ms. Wheeler was
speeding-there was not time for her to avoid hitting Mr. Mitchell once he appeared out from
behind his truck and started across the road in front of her. After Mr. Weckerling's lengthy
direct testimony over two days, the State cross-examined him for three hours. 

 The defense then conducted redirect and clarified Mr. Weckerling's testimony in
several respects. The State briefly re-cross-examined. Then, the defense, on re-redirect
examination, asked a summing-up question: "Sir, based on everything that you have heard,
all of the cross-examination, every exhibit you have looked at, going to the scene, reviewing
every document, autopsy, this, that and the other, what caused the accident?" Mr.
Weckerling responded: "The pedestrian walking in front of the Mustang." The defense
passed its witness for the third time. The record then shows the following:

Court: Anything else?

State: Yes, Your Honor-

Court: Thank you, sir. You may stand down.

State: I have one more question.

Court: I'm sorry I misunderstood you.

State: Are you aware that her insurance carrier found her at fault?

Defense: Your Honor, may we approach?

Court: You don't have to approach. Send the jury out.

 (Jury not present)

Court: Is there a motion in limine on that?

State: Only if she ever paid, Judge-

Defense: Your Honor they filed a motion in limine not to go into any of the insurance
reports. They now have made a statement unsupported in bad faith to create
a mistrial in this case. (4)


Court: Do you want a mistrial?

Defense: Yes, sir-

Defense: (5) With prejudice, Your Honor.

Defense: With Prejudice.

Court: I'm going to take it under consideration. We will recess until Monday
morning at 9:00 o'clock.


 At the Monday conference, the visiting judge stated that he had researched the issues
over the week-end. He listened as both the defense and State set out, at great length, their
respective positions concerning the granting of a mistrial; he questioned the prosecutor
concerning his legal theory for admission of the insurance investigator's conclusion that Ms.
Wheeler was at fault; and, finally, he asked: "Why did you say the very last question, Mr.
[prosecutor]? You cross-examined him for three hours." The prosecutor responded: "Judge,
I've got to ask it sometime." The judge then said,

 I know. I'm just thinking I don't think I need any more argument. It is a very
troublesome case. I made notes for myself. We [have] been at this a month,
nine or ten days of actual testimony. This jury has been in and out of the
courtroom. You all have fought over everything from pictures of a telephone
pole to marking someone else's exhibit. . . .

 There is one issue in this case and that's who is at fault, The defendant as
alleged or the deceased. Both sides knew as of Thursday[,] I told you all I was
going to instruct the jury on concurrent cause . . . . So the only issue in this
case was fault. This question goes right to that. It is not a collateral question,
not a collateral issue. I am going to grant the motion for mistrial.


 The defense later filed an application for a pretrial writ of habeas corpus and a plea
of double jeopardy, which was heard by the presiding judge of the court, who stated that she
had been in daily contact with the visiting judge during the trial, so she understood the issues. 
She explained:

 I also have the benefit of a letter as well as legal case law that he left me when
he left town stating the reasons for his rulings, and quite frankly, some
opinions that he seemed to have on the issue before us today.


 The defense offered various exhibits into evidence and then rested on its pleading. 
The State did not call any witnesses, but the trial judge questioned the prosecutor extensively
about his reasons for asking the offending question, why he thought the question was a
proper one, why he thought his question did not violate Rule 411 of the Texas Rules of
Evidence, (6) and why he thought that the defense had opened the door to the results of the
insurance investigation. The trial judge then questioned the defense about whether it was
clear that Rule 411 prohibits the type of question that the prosecutor asked, as there were no
Texas criminal cases dealing with Rule 411. After both sides had fully explained their
positions, the trial judge ended the hearing without ruling on the defense motion, saying that
she wanted to see the transcript of Mr. Weckerling's entire testimony first. 

 The trial court later denied the defendant's double jeopardy motion and pretrial writ
application, and the defense appealed. The court of appeals reversed the trial court and
dismissed the charges. (7) This Court then granted the State's PDR (8) and remanded the case for
reconsideration under Ex parte Peterson, (9) the newly announced clarification of the Texas
double-jeopardy analysis set out in Bauder v. State. (10) The court of appeals, using the
Peterson analysis, once again concluded that the trial judge abused her discretion in denying
Ms. Wheeler's double-jeopardy claim based on manifestly improper prosecutorial conduct
which forced the defense to request a mistrial. (11) 

II.


 The double jeopardy provisions of the federal and Texas constitutions protect a citizen
from repeated attempts at prosecution for the same criminal offense. (12) However, if a
defendant requests a mistrial, double jeopardy normally does not bar reprosecution. (13) Under
the federal double jeopardy clause, a retrial is prohibited after the defendant requests and is
granted a mistrial only if the prosecution intentionally commits manifestly improper conduct
with the intent to provoke that mistrial. (14) In Bauder v. State, this Court held that, under the
Texas Constitution, double jeopardy principles bar reprosecution when the prosecution acts,
not only with the intent to goad the defendant into requesting a mistrial, but also when the
prosecutor's reckless misconduct requires a mistrial. (15) Under either standard, the
constitutional violation is that of depriving the defendant of his chosen jury, a jury
presumably poised to acquit him.

 In Ex parte Peterson, this Court explained that, under Kennedy, 

 the prosecutor's goal is to terminate a first trial which is going badly. [Under
Bauder], the prosecutor's goal is to "win at any price," either by mistrial and
a subsequent retrial, or by using manifestly improper means to obtain a
conviction in the first trial that he likely would not have achieved otherwise[,]
and the prosecutor is aware that his conduct requires a mistrial if the defendant
should request it. (16)


Peterson explained that Texas courts analyze a federal or state constitutional double-jeopardy
claim under a three-part test:
 1) Did manifestly improper prosecutorial misconduct provoke the mistrial?


 2) Was the mistrial required because the prejudice produced from that
misconduct could not be cured by an instruction to disregard? And


 3) Did the prosecutor engage in that conduct with the intent to goad the defendant
into requesting a mistrial (Kennedy standard) or with conscious disregard for
a substantial risk that the trial court would be required to declare a mistrial
(Bauder standard)? (17)


 The distinction between the federal and state standards is that the former requires a
finding that the prosecutor intended to "goad the defendant into requesting a mistrial"
because the first trial was likely to end in an acquittal, whereas the latter is satisfied by a
finding that the prosecutor acted recklessly and played "foul" to "win at any cost" because
the first trial was likely to end in an acquittal were it tried fairly. (18) 

 Under either standard, the trial court must assess the prosecutor's state of mind: Is it
a culpable one-an intentional "deep-sixing" of the defendant's chosen factfinder by an act
of manifest impropriety or a reckless "win at any cost" act of manifest impropriety. Culpable
intent or recklessness is not always easy to discern in this context. The adversarial "rough
and tumble" of a hotly contested trial conducted by zealous advocates results in much
unplanned, inadvertent, or impulsive rule-violating. (19) In Peterson, we quoted Justice
Powell's concurring opinion in Kennedy, which stressed the importance of relying
"'primarily upon the objective facts and circumstances of the particular case' in determining
the prosecutor's subjective intent, which may often be unknowable." (20) We therefore set out
a list of non-exclusive objective factors to assist trial and reviewing courts in assessing the
prosecutor's state of mind. Those factors include:

 1) Was the misconduct a reaction to abort a trial that was "going badly for the
State?" In other words, at the time that the prosecutor acted, did it reasonably
appear that the defendant would likely obtain an acquittal?


 2) Was the misconduct repeated despite admonitions from the trial court?


 3) Did the prosecutor provide a reasonable, "good faith" explanation for the
conduct?


 4) Was the conduct "clearly erroneous"?


 5) Was there a legally or factually plausible basis for the conduct, despite its
ultimate impropriety?


 6) Were the prosecutor's actions leading up to the mistrial consistent with
inadvertence, lack of judgment, or negligence, or were they consistent with
intentional or reckless misconduct? (21)


 We, like the Supreme Court in Kennedy, are mindful that appellate judges "will not
inexorably reach the same conclusion on a cold record at the appellate stage that they might
if any one of them had been sitting as a trial judge[,]" thus "[i]t seems entirely reasonable to
expect . . . that appellate judges will continue to defer to the judgment of trial judges who are
'on the scene' in this area[.]" (22) In Peterson, we stressed the importance of deferring to the
trial court's assessment of the facts, including the prosecutor's state of mind. Here, as in
other contexts, "appellate courts review the facts in the light most favorable to the trial
judge's ruling and should uphold it absent an abuse of discretion." (23) 

III.


 In the present case, the court of appeals found that the prosecutor's question-"Are you
aware that her [the defendant's] insurance carrier found her at fault?"-was manifestly
improper. (24) We agree. Whatever else it might be, this question was clearly barred by Rules
401-403 of the Texas Rules of Evidence. What Ms. Wheeler's insurance carrier concluded
has very little probative value on the question of whether she caused the fatal accident. There
might be many reasons why the insurance carrier would not dispute liability or would
ultimately concede it. This is akin to asking the testifying defendant if she was aware that
her own attorney-her agent, just as an insurance carrier is a driver's agent-admitted that she
should accept a plea bargain. Lawyers impeach witnesses with specific facts, not with
someone else's legal concession or ultimate factual decision. 

 The prosecutor could have called the insurance investigator as a witness (25) and asked
him about his investigation-what measurements did he take, to whom did he speak, what
calculations did he perform, what opinions, if any, did he reach about the cause of the
accident. But the insurance company's ultimate act of conceding liability is barely (if at all)
probative of appellant's "fault" in causing the accident. And it is extremely prejudicial,
likely to confuse and mislead the jury, and lead to time-consuming collateral litigation. This
is precisely the type of evidence that Tex. R. Evid. 403 is designed to exclude.

 The court of appeals also concluded that the visiting judge granted the mistrial
because the prejudice produced from the prosecutor's improper question could not be cured
by an instruction to disregard. (26) Again, we agree. This was, put charitably, a hair-raising
question, and the visiting judge immediately recognized it as such. The defense did not even
request a mistrial before the judge asked whether the defense wanted one. The judge
reasonably concluded that once this skunk was in the jury box, there was no way to hide the
smell. No instruction to disregard would still the reverberations ("even her own insurance
carrier thought she was at fault; it wouldn't stick up for her"). This was a statement of fact,
with a question mark appended at the end, which went to the very heart of the single, hotly
disputed, issue in this trial. The court of appeals correctly concluded that the second prong
of the Peterson test was met. (27)

 We part company with the court of appeals's analysis, however, on the third prong-
whether the prosecutor asked this question with the intent to goad the defense into requesting
a mistrial (Kennedy) or with conscious disregard of a substantial risk that the trial court
would be required to grant a mistrial (Bauder). (28) On this third prong, the court of appeals
failed to view the objective facts in the light most favorable to the trial judge's ruling. The
court of appeals explicitly stated that it was employing a de novo review of the facts, rather
than a deferential one, because the trial judge who conducted the habeas hearing was not the
same judge who presided over the trial and granted the mistrial. (29) 

 First, as a matter of law, reviewing courts defer to the trial court's implied factual
findings that are supported by the record, even when no witnesses testify and all of the
evidence is submitted in written affidavits. (30) 

 Second, in this case, the trial judge personally presided over the habeas hearing and
was well-positioned to make credibility decisions. Although she did not preside over the
underlying trial, at the writ hearing she stated that she had been in "daily" communication
with the visiting judge. "I mean, I can't even begin to tell you how many times I talked to
him during y'all's trial. . . . So I feel very comfortable that I understand the issues." She also
said that the visiting judge left her a letter "stating the reasons for his rulings" and "some
opinions that he seemed to have on the issue" at the writ hearing. Further, the trial prosecutor
stood in front of her, and, while he did not formally testify, she quizzed him extensively
concerning his reasons for asking the offending question. She could gauge his credibility and
demeanor during this face-to-face colloquy. (31) She may have had prior knowledge of this
prosecutor, and her assessment of his credibility could well be based upon those prior
experiences as well as the cogency and genuineness of his explanation. 

 Third, the record shows that the trial judge did not make a hasty or ill-informed ruling. 
At the writ hearing, she had the transcripts of both the pertinent excerpts from the trial and
the Monday mistrial hearing. She stated that she had also done some research on the double
jeopardy issue, but she wanted to defer any ruling until she reviewed a transcript of the
entirety of the defense expert's testimony, as well as any other testimony that either side
thought important. This was a trial judge who was exercising her discretion carefully and
cautiously, not one who was making an "off-the-cuff" ruling. Thus, she was the "Johnny-on-the-Spot" factfinder at the habeas hearing; this Court must view the objective facts in the
light most favorable to her ruling (32) and uphold that ruling absent an abuse of discretion.

 Here, the objective facts do not show that the trial judge abused her discretion in
concluding that the prosecutor honestly (though misguidedly) thought that his question was
permissible. We assess the objective facts in light of the six factors set out in Peterson.

 1. Was the trial going badly for the State?

 Both the State and the defense sponsored well-qualified, articulate expert witnesses. 
They came to opposing conclusions on the hotly disputed issue of who caused the accident:
Ms. Wheeler or Dr. Mitchell. At the time of the mistrial, it was an evidentiary "neck-and-neck" horse race. However, at the mistrial motion hearing, the prosecutor stated that the
insurance investigators were under subpoena and "we can bring them down here." Indeed
it could and should have done so. (33) Then the State could have pointed to an independent
expert-working for neither the State nor the defense attorney-who had reached the same
factual conclusion (assuming that he did) as that reached by the State's expert. (34) This
prosecutor was in an enviable evidentiary position. In fact, the visiting judge asked the
prosecutor why he did not call the adjuster to testify to his investigation during the mistrial
hearing, and the prosecutor responded, "That's one possible way." But then he argued, "As
far as how I can prove it, I can prove it through asking questions of Mr. Westerlink [sic]." (35) 
 On that score he was resoundingly wrong, but there is no indication that this was a trial that
the prosecution was losing. (36)

 Ms. Wheeler argues that the prosecutor "clearly saved the [offending] question for the
very last instant. This was the last question, for the last witness, for the last day of trial. The
timing of this question is proof that the prosecutor intentionally saved this 'zinger' for last." 
Well, it was the last question of the trial since the trial ended because of this question, but
no one knows what might have occurred had this question not been asked. Perhaps the State
would have called the insurance adjuster to testify to his investigation. Furthermore, the
record does not support any suggestion that the State "saved" this "zinger" question. It had
ended its initial cross-examination of Mr. Weckerling without asking this question, and it
could not predict whether the defense would re-direct. It had ended its re-cross-examination
of Mr. Weckerling without asking this question, and, again, it could not predict whether the
defense would re-re-direct. It was only when the defense asked its summing-up question,
including a reference to "all" of the materials that Mr. Weckerling had reviewed, that the 
State, on its third cross-examination, asked its fatal question. In context, the prosecutor
appears more rash than Machiavellian.

 2. Did the State repeat its misconduct despite admonitions from the Court?

 This factor focuses on the wilfulness of repeated misconduct by the prosecutor. There
was no repeated misconduct. Ms. Wheeler argues that the prosecutor violated its own motion
in limine by asking this question and that conduct shows wilfulness. But the State's motion
in limine barred only the mention of a "monetary settlement," not any mention of an
insurance carrier's investigation. The defense had filed a motion in limine barring "[a]ny
statements of any witness that the defendant is guilty of any offense being tried," and that
motion, though close, is not a clear reference to the insurance carrier's finding of "fault." 
Furthermore, a single violation of a motion in limine is insufficient to show repeated, wilful
violations made despite judicial admonitions.

 3. Did the prosecutor provide a reasonable "good faith" explanation for the
conduct? 

 At the mistrial hearing, the prosecutor offered two explanations for his question: First, 
he thought (incorrectly) that Mr. Weckerling "had seen the materials from an insurance
investigation," thus "this issue is already before the jury as to an insurance investigation." 
Second, he noted that 

 the last question by defense counsel prior to passing a witness for recross
[was] in reference to causation and fault of the victim. I certainly think it is
fair impeachment of any expert who comes in here and gives an opinion as to,
one, things they have reviewed, and, two things they have reviewed that are
contrary . . . . First of all, I did ask him did he review material from insurance
investigations. He said he looked at it; therefore, anything he's looked at is
open for me to impeach him or cross-exam him on. The rules specifically
allow for that.


 There is no indication anywhere in the record that the prosecutor did not sincerely, but
mistakenly, believe that Mr. Weckerling had, in fact, reviewed the insurance report. (37) The
prosecutor repeatedly explained, both at the mistrial hearing and at the writ hearing, that he
based his question upon this fact. It turns out that this "fact" is wrong. The prosecutor may
have misheard the witness or confused the testimony of his own expert (who had reviewed
the insurance investigation report) with that of the defense, but that does not make him either
wilful or reckless. Of course, even if Mr. Weckerling had reviewed the entire file, the
prosecutor could not ask the precise question that he did ask, but he could have asked about
specific facts and data, calculations, and whether and why the defense expert thought the
other investigator's opinion about the cause of the accident was inaccurate. 

 The court of appeals stated that, toward the end of the mistrial hearing, the visiting
judge asked the prosecutor why he had asked that particular question, and the prosecutor
responded, "Judge, I got to ask it sometime." (38) Only those present in the courtroom at the
time could determine whether this statement was made in a flippant or earnest manner, but,
on its face, the statement suggests that the prosecutor thought his was a proper question. At
any rate, this ambiguous response came long after the prosecutor had explained his reasons
for the question.

 4. Was the conduct "clearly erroneous"?

 The prosecutor's question brought an immediate halt to the proceedings. There seems
no doubt that the visiting judge instantly thought it was a "clearly erroneous" question that
could not be cured by an instruction to disregard. There seems little doubt that the trial judge
also thought this question was "clearly erroneous," and during the writ hearing she was
simply seeking an explanation from the prosecutor as to his reasoning for asking the
question. Although the prosecutor, defense attorney, and trial judge all focused on whether 
the question was prohibited or allowable under Rule 411 of the Texas Rules of Evidence, that
rule does not really speak to the propriety of the question.

 Rule 411 prohibits the parties from inquiring about the existence of insurance offered
to show that the insured was negligent or otherwise at fault. (39) The prohibited inferences are
that (1) one who has insurance is more likely than others to be negligent because he is
protected by insurance; and (2) an insurer has "deep pockets" and thus could afford to pay
any judgment against its insured. (40) The prosecutor's question did not go to the existence of
insurance (a fact that had been mentioned several times during this trial), but rather to the
insurance carrier's apparent ultimate decision to accept fault by its insured, Ms. Wheeler. 
Thus, the prosecutor was technically correct that Rule 411 would not directly bar his
questioning, but his question was far more prejudicial (and more misleading) than any mere
mention of the existence of insurance as proof of Ms. Wheeler's negligence or fault. The
question stated the result of an insurance investigation and the conclusion that Ms. Wheeler's
own agent, her insurance carrier, had conceded her "fault." Thus, the question was outside
Rule 411, but even more prejudicial than the questioning that is prohibited by that rule.

 5. Was there a plausible basis for the prosecutor's conduct?

 There was, as discussed above, a very reasonable basis for asking Mr. Weckerling
whether he had reviewed any expert investigations or reports other than the one prepared by
the police. There was a plausible basis for cross-examining him on the importance of
reviewing all materials and sources connected to an accident investigation before reaching
an opinion. This was a fruitful area of impeachment, and the State could have then called
the "other" investigator during rebuttal to discuss his underlying data and opinion on the
cause of the accident. Thus, the area of inquiry was entirely appropriate, but the specific
question actually asked by the prosecutor was entirely inappropriate. 

 6. Were the prosecutor's actions leading up to the mistrial consistent with
inadvertence, lack of judgment or negligence, or were they consistent with
intentional or reckless misconduct?


 This was a hotly contested trial and, given its duration and various contretemps
between the advocates, tempers were hot on both sides. As the visiting judge plaintively
concluded, both sides acted "playgroundish." The objective record bears out this assessment. 
Both the State and defense were very zealous in putting forward their respective factual and
legal positions. The advocates clashed repeatedly. The visiting judge assessed no intentional
or reckless fault against either side, but he might well have taken into account the rising
tempers and trial fatigue by both sides as contributing to the prosecutor's final, fatal question.

IV.


 In sum, we agree with the court of appeals that the visiting judge did not abuse his
discretion in granting the mistrial when the prosecutor asked a manifestly improper
question. (41) But, viewing the objective facts in the light most favorable to the trial judge's
ruling, we cannot say that the trial judge abused her discretion in denying relief on Ms.
Wheeler's double-jeopardy claim. Factually, this is a close case, and, had the trial judge
ruled that double jeopardy did bar any retrial, we would, of course, uphold that ruling as well. 
Rational people can differ about whether, given these facts, it is a reasonable inference that
the prosecutor was intentionally goading the defense into asking for a mistrial (the federal
Kennedy (42) standard) or acting with conscious disregard of a substantial risk that the trial court
would be required to declare a mistrial (the state Peterson/Bauder (43) standard). That is
precisely why we, as a reviewing court, must defer to the trial judge's factfinding.

 From all appearances, the prosecutor could well have thought that the trial was going
fine. It is reasonable to conclude that he was, in his own mind, just giving the coup de grace
to the defense expert. We cannot disagree with the trial judge's implicit conclusion that this
was a question that was asked in good faith, albeit an impetuous, perhaps even stupid,
question. The trial judge saw the prosecutor and could judge his credibility and integrity; she
was entitled to conclude that the prosecutor acted with unwarranted zeal rather than malice
or reckless disregard for the defendant's rights. We cannot say that the trial judge abused her
discretion in finding that neither Kennedy nor Peterson would bar the defendant's retrial.

 We therefore reverse the judgment of the court of appeals and remand this case to the
trial court for further proceedings.

Delivered: October 4, 2006

Publish
1. Ex parte Wheeler, 146 S.W.3d 238, 253 (Tex. App.-Fort Worth 2004).
2. We granted the State's five grounds for review:

1) Did the court of appeals err by misapplying the standard of review mandated by this
Court in Ex parte Peterson to be utilized in determining when a successive prosecution is
jeopardy barred after a declaration of a mistrial at a defendant's request?

2) Did the court of appeals err by shifting the burden of proof to the State in the hearing on
the appellant's pre-trial writ of habeas corpus?

3) Did the court of appeals err by holding that the prosecutor's action in mentioning the
appellant's insurance carrier was prohibited and inadmissible under Tex. R. Evid. 411
and was incurable by instruction to disregard?

4) Did the court of appeals err by holding that the appellant did not "open the door" to the
prosecutor's questioning of her accident reconstruction expert about whether the expert
considered the insurance company's report as to fault?

5) Should this Court re-adopt the standard of review articulated in Oregon v. Kennedy?

Because the State's first ground for review is dispositive, we need not address its remaining
grounds.
3. Because of various continuances and recesses, Mr. Lovett's testimony was not
completed until twelve days after it began. By then, the advocates' tempers were frayed. At one
point the visiting judge noted, outside the presence of the jury, "Both sides are being
playgroundish. I'm getting tired of it. . . . It seems to me that it's juvenile on both sides."
4. The State's motion in limine did not mention insurance or insurance reports; it requested
that no mention of any "monetary settlements" be made.
5. Ms. Wheeler was represented by two attorneys at trial.
6. Rule 411 reads:

 Evidence that a person was or was not insured against liability is not admissible
upon the issue whether the person acted negligently or otherwise wrongfully. This
rule does not require the exclusion of evidence of insurance against liability when
offered for another issue, such as proof of agency, ownership, or control, if
disputed, or bias or prejudice of a witness.

Tex. R. Evid. 411.
7. Ex parte Wheeler, 61 S.W.3d 766 (Tex. App.-Fort Worth 2001).
8. Ex parte Wheeler, 122 S.W.3d 170 (Tex. Crim. App. 2003).
9. 117 S.W.3d 804 (Tex. Crim. App. 2003).
10. 921 S.W.2d 696 (Tex. Crim. App. 1996).
11. Wheeler, 146 S.W.3d at 253.
12. Green v. United States, 355 U.S. 184, 187 (1957) ("The underlying idea [of double
jeopardy] . . . is that the State with all its resources and power should not be allowed to make
repeated attempts to convict an individual for an alleged offense, thereby subjecting him to
embarrassment, expense, and ordeal and compelling him to live in a continuing state of anxiety
and insecurity, as well as enhancing the possibility that even though innocent he may be found
guilty").
13. Oregon v. Kennedy, 456 U.S. 667, 672-73 (1982).
14. Id. at 676.
15. Bauder v. State, 921 S.W.2d 696, 699 (Tex. Crim. App. 1996).
16. Peterson, 117 S.W.3d at 815, n.37 (citing Bauder, 921 S.W.2d at 699).
17. Id. at 816-17.
18. See, e.g., People v. Batts, 30 Cal. 4th 660, 666, 68 P.3d 357, 361 (2003) (holding that
the state constitutional double jeopardy clause may bar retrial when the prosecutor subjectively
believes that an acquittal was likely when he intentionally committed misconduct and the court
determines "from an objective perspective that the misconduct actually deprived the defendant of
the reasonable prospect of an acquittal") (emphasis in original); see also United States v.
Wallach, 979 F.2d 912, 915 (2d Cir. 1992) (noting, in dicta, that double jeopardy principles
would logically bar a second prosecution when the prosecutor engages in serious misconduct
with the intention of preventing an acquittal).
19. See Peterson, 117 S.W.3d at 817-18.
20. Id. at 812 (quoting Kennedy, 456 U.S. at 679-80 (Powell, J., concurring)).
21. Id. at 818-19.
22. Kennedy, 456 U.S. at 677 n.7.
23. Peterson, 117 S.W.3d at 819. As a caveat, however, this Court also noted, "Although
reviewing courts should also grant deference to 'implicit factual findings' that support the trial
court's ultimate ruling, they cannot do so if they are unable to determine from the record what the
trial court's implied factual findings are." Id.
24. Wheeler, 146 S.W.3d at 249 ("We therefore conclude that the prosecutor's question
was not only manifestly improper, just as the visiting trial judge had found, but also was the
catalyst that provoked the mistrial").
25. Reasonable people might disagree about whether his specific employer-the defendant's
insurance company-could be identified. That issue is not before us.
26. Wheeler, 146 S.W.3d at 250-51.
27. See Wheeler, 146 S.W.3d at 251 ("Under the objective facts and circumstances
presented in this record, we conclude that no instruction could have cured the prejudice that must
have flowed from the prosecutor's question revealing that appellant's own insurance company
had found her at fault-again, the key issue of the case").
28. Because the resolution of this third prong does not depend upon any distinction
between the federal (
Kennedy) and state (Bauder) constitutional standards, we do not address the
State's fifth ground which asks this Court to re-adopt the single standard articulated in Kennedy.
29. Wheeler, 146 S.W.3d at 246-47. The court of appeals explained:

 In this case, neither party offered testimony on the merits of the petition at the
habeas hearing; the parties had previously presented their arguments for and in
opposition to granting a mistrial and dismissal with prejudice at the mistrial
hearing held by the visiting judge. That judge granted appellant's motion, and the
arguments and record from that hearing were offered into evidence at the writ
hearing. However, the presiding judge, who ultimately heard the petition, was not
the same judge who . . . presided over appellant's first trial and granted the
mistrial. Thus, the trial court's rulings at the habeas hearing could not have turned
on credibility and demeanor. Because the presiding judge who heard and ruled on
the habeas petition was not in any better position to determine questions of fact
and to apply the law to those facts than we would be, we will undertake a de novo
review applying the new Peterson three-prong analysis.

Id. (footnote omitted).
30. See, e.g., Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (reviewing
courts "must view the evidence in the light most favorable to the trial court's ruling and presume
that all reasonable factual findings that could have been made against the losing party were made
against that losing party" even when all evidence is submitted by affidavit); Manzi v. State, 88
S.W.3d 240, 244 (Tex. Crim. App. 2002) ("Trial courts are the traditional finders of fact, and
their determinations of historical fact are entitled to deference" even when the facts are in the
form of an affidavit).
31. In Batson hearings, for example, the advocates rarely testify formally, yet appellate
courts recognize that trial judges assess credibility as well as the accuracy and genuineness of the
advocates' explanations. See Gibson v. State, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)
(stating that "appellate courts must apply a 'clearly erroneous' standard of appellate review to a
trial court's ruling on a Batson claim" because "the trial court is in the best position to determine
whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral"); Jasper v. State, 61 S.W.3d 413, 421-22 (Tex. Crim. App. 2001) (stating that the trial
judge is in a unique position to determine whether a prosecutor exercised a peremptory challenge
for race-neutral reasons, therefore the trial judge's decision is accorded great deference and will
not be overturned unless it is clearly erroneous).
32. We note that neither the defense nor the State requested findings of fact. See, e.g.,
State v. Cullen, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (holding that "upon the request of
the losing party on a motion to suppress evidence, the trial court shall state its essential
findings"). 
33. What the prosecutor could have legitimately done is question Mr. Weckerling about the
materials he reviewed and ask him whether he reviewed the report of "Mr. Whoozits" (who
happens to be the insurance investigator). If he did not do so, thank him very much. Then call
Mr. Whoozits in rebuttal and carefully walk him through his report. If the defense expert said
that he had reviewed Mr. Whoozits's report but disagreed with it, thank him very much, and then
call Mr. Whoozits in rebuttal and walk him through it. In either scenario, the defense expert has
been effectively impeached, but without saying a word about Ms. Wheeler's insurance company
or its ultimate decision to concede liability.
34. The defense had attacked the investigation conducted by the police, calling it
"botched." The testimony of a "neutral" expert would have rehabilitated and reinforced the
accuracy of the police investigation and of the State's expert.
35. Memories being what they are, both the prosecutor and the defense recalled some
things inaccurately. The prosecutor apparently thought that Mr. Weckerling had said that he had
reviewed the insurance adjuster's file. The witness said that he "knew" about some insurance
material, but he did not say that he had "reviewed" an insurance report. He relied upon the
insurance adjuster's tape-recorded statement of Mr. West, but it is unclear whether he also knew
that the recording was made by the insurance carrier. Meanwhile, the defense said that both it
and the State had filed motions in limine barring any mention of insurance. In fact, neither had. 
36. The court of appeals had concluded that the trial was going badly for the State because
"the visiting judge had already notified that parties the day before the prosecutor asked the
improper question that he was going to give the jury the 'concurrent cause' question. This
question would ask who was at fault before even asking the jury whether appellant had the
requisite mental intent required for conviction." 146 S.W.3d at 252. Once the issue became one
of whose fault the accident was, a concurrent causation instruction would be appropriate and
presumably helpful to the State. Although submission of a "concurrent cause" instruction might
increase the prejudicial effect of the prosecutor's question, it has little relationship as to whether
the prosecutor thought his case was going badly and therefore had to be resurrected with a
manifestly improper question or had to be terminated with a mistrial.
37. When the prosecutor asked Mr. Weckerling if he had reviewed "other investigations by
an insurance company or other individuals," the witness said, "I think there is something in there,
but I have not reviewed that." At the writ hearing, the defense explained that his expert "did not
have any conclusions of the insurance" report because "we did not give them, the witness, that
particular file." The fact that the defense expert did not have access to all of the pertinent
existing investigative reports is, of course, a fair topic for impeachment.
38. Wheeler, 146 S.W.3d at 252.
39. See Fed. R. Evid. 411, advisory committee note; Stephen A. Saltzburg, et. al.
Commentary, Fed. R. Evid. 411.
40. See generally 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal
Evidence § 153 at 176 (2d ed. 1994) (setting out both the relevance theory of insurance inclining
a party toward negligence and the prejudice theory that juries will be more likely to find liability
because of insurance coverage); see also AccuBanc Mortgage Corp. v. Drummonds, 938 S.W.2d
135, 151-52 (Tex. App.-Fort Worth 1996, writ denied).
41. 146 S.W.3d at 253.
42. Kennedy, 456 U.S. at 673 (explaining that the "intentional goading" standard was
designed to protect a defendant whose motion for mistrial could not fairly be considered a result
of his own free will; "in such a case, the defendant's valued right to complete his trial before the
first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later
invocation of the bar of double jeopardy in all circumstances").
43. Ex parte Peterson, 117 S.W.3d at 817.